## In re CON-ELEC CORPORATION d/b/a Wolf's Lair

[716 A.2d 822]

No. 96-487

June 19, 1998. Licensee Con-Elec Corporation, d/b/a Wolf's Lair, appeals from a decision of the Vermont Liquor Control Board, which revoked its first-class and third-class licenses to sell alcoholic beverages for on-premises consumption. Licensee contends that (1) the Board exceeded its authority by partially basing the revocations upon proscribed activities, which are beyond the scope of the Board's enabling legislation, and (2) the factual findings, with regard to licensee's violation of several of the Board's regulations, were clearly erroneous and unsupported by the evidence. We affirm.

After a hearing before the Board, licensee was found to have violated the Board's General Regulation No. 9 (illegal gambling), No. 19 (intoxicated patrons), No. 41 (disorderly conduct), and No. 49 (refilling bottles), and the Board's Credit Regulation No. 2 (credit sales). Due to these violations, licensee's liquor licenses were revoked. This appeal followed.

With regard to the violation of Regulation No. 9,[1] licensee's sole argument on appeal is that the Board exceeded its authority by promulgating a regulation prohibiting illegal gambling on licensed premises. In its decision, the Board found, and the licensee does not dispute, that the licensee's employees sold break-open tickets on the licensed premises from the time it was first licensed in 1994 until the present case was filed in 1996. The evidence before the Board indicated that the gambling was constant and that "the proceeds were substantial."[2]

This Court has not hesitated to strike down a Liquor Control Board regulation where there is no "nexus between the regulation . . . and the consequences of excessive use of alcohol." *In re Club 107*, 152 Vt. 320, 324, 566 A.2d 966, 968 (1989). In *Club 107*, we held that "the mere coincidence of the sale of liquor and some other activity is not — by itself — sufficient to allow the Board to regulate the other activity." *Id.* Central to our decision in *Club 107* was the fact that the Legislature had not spoken about live entertainment in establishments serving alcoholic beverages, nor had it authorized the Board to regulate the activity at issue. See *id.* at 325, 566 A.2d at 969; accord *SBC Enterprises, Inc. v. City of S. Burlington Liquor Control Comm'n*, 166 Vt. 79, 84, 689 A.2d 427, 430 (1996) ("[T]he Board may not, through promulgation of regulations, expand its authority into areas of activity that are beyond the focus of Title 7.").

Thus, licensee's reliance on *Club 107* is misplaced. Unlike the challenged regulation in *Club 107*, the Legislature has spoken directly and clearly about the distribution of break-open tickets on premises licensed to sell alcoholic beverages. Section 10203(f) of Title 32 provides in relevant part:

> Break-open tickets shall not be sold at premises licensed to

---

[1] General Regulation No. 9 reads in pertinent part: "No licensee shall . . . permit said [licensed] premises to be used for illegal gambling purposes."

[2] At the hearing before the Board, licensee maintained that the gambling activity conducted on the premises had been organized and executed on behalf of a nonprofit corporation. See 13 V.S.A. § 2143 (permitting nonprofit organizations, in limited circumstances, to organize and operate games of chance). The Board, however, found that licensee, a for-profit business, had purchased the tickets with its own funds and then sold the break-open tickets at retail. Licensee abandons this argument on appeal.

sell alcoholic beverages except at clubs as defined in subdivision 2(7) of Title 7. However, a non-profit organization may sell break-open tickets at premises licensed to sell alcoholic beverages if, notwithstanding 13 V.S.A. § 2143(e), all proceeds from the sale of break-open tickets are used by the nonprofit organization exclusively for charitable, religious, educational and civic undertakings . . . .

The Legislature has imposed a flat prohibition against the sale of tickets on licensed premises by any entity other than a nonprofit organization. See also 13 V.S.A. § 2101 (Cum. Supp. 1997) (banning games of chance unless conducted by nonprofit organizations as provided in 13 V.S.A. § 2143). Regulation No. 9 merely prohibits what the Legislature has proscribed. The Board has not presumed to define and outlaw any gambling activity that is otherwise legal or to impose further regulation in a field fully occupied by the Legislature. Regulation No. 9 protects "the public welfare [and] good order," 7 V.S.A. § 1, by conditioning the license privilege on compliance with a statute that regulates gambling on licensed premises, and thus, its promulgation and enforcement did not exceed the Board's authority.

Licensee also claims that the Board's findings of fact, with regard to violations of General Regulation Nos. 49, 19, and 41, are clearly erroneous and unsupported by the evidence. We disagree. The Board found that licensee instructed its bartenders "to funnel liquor from gallon bottles into smaller bottles ('fifths')," a violation of Regulation No. 49,[3] and if

questioned, "to say that it was done strictly for catering purposes." The Board's findings are supported by the testimony of two witnesses, one a former bartender who testified that the practice occurred possibly "hundreds" of times. The owner, the bar manager, and a present bartender contradicted this testimony, but as we have stated often, credibility of witnesses "is a matter for the trier of fact to judge." *In re Johnston*, 145 Vt. 318, 322, 488 A.2d 750, 753 (1985). There was no error.

In regards to the violation of Regulation No. 19,[4] the Board found the following: That on March 12, 1996, a patron visited the licensed premises in the afternoon, left, and then returned in the early evening. She consumed three or four alcoholic beverages on her first visit and "more than four or five" on her second visit. By her own account, "she became so intoxicated that she was unable to [recall] many of the later events of the night." Other patrons readily observed that the woman was "hammered," "drunk" and "highly intoxicated," and that she was crying, stumbling, and slurring her words. The woman had as many as three drinks in front of her at one time, and she tried to take a drink from another patron thinking it was hers. The licensee did not intervene until the intoxicated patron fell down while attempting to leave the bar, at which point the woman was helped back into the bar by the licensee and allowed to remain. It was not until the police arrived in response to a fight on the premises that she was removed by the police from the premises. Testimony indicated that she spent the night in the detoxication unit at a correctional facility.

---

[3] General Regulation No. 49 states that "Licensees shall not reuse, refill or tamper with any bottle of alcoholic liquor, nor shall such licensee adulterate, dilute,

fortify, or cause any substitution of any nature to be made in or to the contents of any bottle of alcoholic liquor."

[4] General Regulation No. 19 provides in part that "No person under the influence of alcoholic liquor shall be allowed to loiter on the licensed premises."

The Board found that "the licensee had permitted [the patron] to consume vastly excessive amounts of alcoholic beverages and to remain on the premises for far too long for her safety and for the safety of the general public." Licensee argues that the patron was "shut off" as soon as her intoxication was noticed. Further, licensee argues that the patron failed to cooperate with licensee's attempts to send her home and that licensee "did all that it could" to remove her in a timely manner, and that the Board failed to consider the licensee's efforts. The evidence supports the Board's findings and its conclusion that the licensee allowed an intoxicated patron to remain on the licensed premises. Regardless of the efforts made by licensee, it was within the Board's discretion to decide that those efforts were too little too late and that the licensee had failed in its duty to prevent the loitering of an intoxicated person. We find no error.

The evidence also supports the Board's finding that the licensee failed to control the conduct of its patrons and allowed fighting to occur on the premises in violation of Regulation 41.[5] The findings of the Board describe a physical altercation in the bar between two patrons that then escalated into a parking lot fight. Following a shoving incident in the bar, the licensee's owner separated the men, but took no further action. The patrons were not ejected and the police were not called. Instead, the owner allowed both men to remain on the premises, and to continue to drink at the bar. Continuing a verbal offensive, one of the patrons repeatedly made "very explicit" threats of further physical contact, specifically requesting a fight with the other. Only after one of the men "sucker punched" the other man did the licensee's owner eject the man who was punched. As the ejected patron exited the bar, the other man followed immediately, and the fight recommenced just outside the bar.

Licensee contends that the owner did "take immediate and appropriate preventative action as warranted by the situation." We disagree. The language we used in *In re Capital Investment, Inc.*, where the facts were strikingly similar to those at bar, fits the present case well:

> [T]he Board pointed to the fact that licensee deposited one combatant to the original altercation outside the premises, still in a combative mood, without supervision, despite his obvious state of intoxication and his threats of dire harm to the other participant of the fight, who remained inside the premises. . . . The Board properly construed General Regulation No. 41 in finding that licensee had permitted or suffered prohibited conduct on its premises, and the evidence supports the Board's conclusion that licensee failed in its *affirmative duty* to keep the public areas adjacent to the premises from becoming a public nuisance.

150 Vt. 478, 483, 554 A.2d 662, 666 (1988) (emphasis added).

Similarly, the licensee in this case did not take appropriate affirmative action. After physical contact between the combatants and clear signs of escalation, the owner permitted both to remain at the bar. Only after a second fight inside the bar did the owner eject one of the combatants. The owner, however, did nothing

---

[5] General Regulation No. 41 provides in part that "It shall be the duty of all licensees to control the conduct of their patrons at all times. . . . No disturbances, brawls, fighting, unlawful conduct, shall be permitted or suffered upon any licensed premises; nor shall such premises be conducted in such a manner as to render said premises or the streets, sidewalks or highways adjacent thereto a public nuisance."

to prevent the other combatant from following the first outside, or prevent the fight to resume. Licensee's failure to meet its "affirmative duty" was clear and substantial.

Finally, licensee does not challenge the Board's finding that licensee violated the Board's Credit Regulation No. 2 by "routinely and repeatedly" selling drinks on credit, and allowing customers to run tabs "exceeding $100 and even $200."[6] Instead, licensee claims that it was not aware of the regulation and that the violations were de minimis. We need not reach the question of whether these credit violations were serious enough to warrant revocation of licensee's liquor licenses. Given the full record in this matter, we conclude that licensee's violations of the Board's General Regulations were substantial and covered a wide variety of misconduct. Thus, the Board was within its rights to revoke the licensee's liquor licenses, and the licensee will not be heard to argue that the revocation hangs on a technicality.

*Affirmed.*

---

[6] Credit Regulation No. 2 provides in part that "No malt or vinous beverages or spirituous liquor shall be sold on credit by any licensee holding a first or third class license, except hotels to their registered guests."