NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 120

No. 2017-398

| | |
|---|---|
| Tracy Stopford, Individually, and as Administrator of the Estate of Jordan Preavy and Sean Preavy | Supreme Court |
| | |
| v. | On Appeal from Superior Court, Chittenden Unit, Civil Division |
| | |
| Milton Town School District and Milton Town School Board et al. | April Term, 2018 |

Robert A. Mello, J.

Robert Appel, Burlington, for Plaintiffs-Appellants.

Pietro J. Lynn and Adrienne Shea of Lynn, Lynn, Blackman & Manitsky, P.C., Burlington, for
 Defendants-Appellees.


PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.


¶ 1. **CARROLL, J.** Plaintiffs appeal from the trial court's order granting defendants' motion for summary judgment on their negligence claims. Plaintiffs are Jordan Preavy's mother, Tracy Stopford, in her individual capacity and as administrator of his estate, and his father, Sean Preavy. They allege that their son took his own life as a result of being assaulted by some of his teammates on the Milton High School football team, which, according to plaintiffs, the school negligently failed to prevent. On appeal, plaintiffs argue that the court did not properly apply the summary judgment standard nor the appropriate duty of care and that it erred when it concluded that plaintiffs failed to prove that the assault was foreseeable and that it was the proximate cause

of Jordan's suicide.[1]  In addition, plaintiffs argue that the court improperly imposed a monetary sanction on their attorney after finding that he engaged in a prohibited ex parte communication with defendants' expert witness.  We affirm.

¶ 2.     In 2009, Milton High School administrators learned that students at the school, including football players, were playing a game the students called "no homo."  The game entailed a student complimenting another same-sex student and then immediately stating "no homo," apparently to signify that the speaker was not a homosexual.  In November of 2009, the football coach told the members of the team to stop playing the game and then held a team meeting after learning that some members of the team ignored his request.  He informed the team that there would be dire consequences if he heard that the team continued to play the game.  The school's athletic director wrote a letter to parents and explained that the school was "looking into instances of verbal harassment and otherwise inappropriate conversations and behaviors" by teams at the school.  He scheduled another team meeting and notified parents of the meeting.  The coach and athletic director then instituted a "Positive Corrective Action Plan" that included placing the football team on behavioral probation for the 2010 season.  After this, school officials did not witness or receive reports of football players playing the "no homo" game or engaging in any other incidents of verbal or physical harassment—or even any other inappropriate behavior—until Spring 2013, many months after Jordan's death.

¶ 3.     Jordan Preavy transferred to Milton High School in the fall of 2011 from Essex High School.  He joined the football team and attended a team dinner on school grounds in August 2011.  During this event, while the team had congregated on the soccer field and was separated from the adults attending the dinner, a member of the team held Jordan down while another

---

[1]  Because we affirm the court's decision finding that defendants did not breach the applicable duty of care, the issue of causation is moot and we do not address it.

assaulted him with a broomstick by jabbing it at his buttocks through his clothing.[2] Jordan did not tell his parents about the incident nor make a report to the school. In August 2012, Jordan stopped playing football due to a conflict with his lacrosse schedule. On August 28, 2012, he took his own life.

¶ 4. In the spring of 2013, a teacher at the school learned about the 2011 assault from his son and reported it to school administrators. This was the first time the school administration was notified of the incident. The Chittenden Unit for Special Investigations (CUSI) began an investigation into the assault and interviewed several members of the football team. Interviewees described some football team members' ongoing practices of exposing their genitals to other players, pretending to "hump" teammates, and shoving their exposed genitals into other players. One member of the team told investigators that he decided to discontinue playing football so as not to be associated with this behavior. Another interviewee "had always heard about" similar incidents prior to joining the team in 2009. Some of these behaviors occurred in the "Blockhouse," a former storage structure which was being used by the football team as a locker room; it also housed an office for the coaches. The CUSI investigation culminated in criminal charges against two members of the football team and subsequent convictions for their roles in the assault on Jordan.

¶ 5. Plaintiff Stopford, in her capacity as the administratrix of her son's estate, originally brought claims of negligence and violation of the Vermont Public Accommodations Act (VPAA) against Milton Town School District, Milton Town School Board, Milton High School Board, Milton Town School District Superintendent John Barone, Sr., and Milton High School Principal Anne Blake in their official capacities. In addition, plaintiffs Stopford and Sean Preavy, in their

---

[2] The record is not clear as to whether the broomstick penetrated Jordan's rectum and, therefore, we use the term "at." Resolution of this factual dispute is not required in order to decide the issues before us.

individual capacities, brought a claim for loss of parental consortium against the same defendants. Defendants filed a motion for judgment on the pleadings seeking dismissal of the loss of consortium claims and the claims against Barone and Blake, arguing they were barred by the statute of limitations. The trial court granted the motion, and plaintiffs have not appealed this ruling. The negligence and VPAA claims against Milton Town School District, Milton Town School Board, and Milton High School Board remained.[3]

¶ 6.     Defendants then filed a motion for summary judgment, seeking dismissal of both remaining claims.[4] Defendants asserted that the undisputed facts did not support plaintiff's negligence claim. Specifically, defendants argued that plaintiffs were unable to prove that defendants breached a duty of care owed to Jordan. Defendants contended that they owed Jordan the duty of ordinary care, pursuant to 16 V.S.A. § 834(a), and that they did not owe a duty to protect Jordan from an assault by team members because this was not foreseeable. In general, this argument rested on the lack of evidence that Jordan had been the subject of harassment prior to the 2011 incident, and that he had never reported any harassment to the school. And, defendants argued, the nature of the victimization suffered by Jordan during the assault involved physical assault, rather than verbal harassment, and thus was unlike and more severe than the one ritual conducted by members of the football team that the school was aware of (the "no homo" game).

¶ 7.     Plaintiffs opposed defendant's motion for summary judgment, asserting that, even though § 834(a) sets out a duty of ordinary care under these circumstances, § 834(b), which dictates that school districts "do not owe their students a duty of immediate supervision at all times and under all circumstances," did not narrow the common law duty of care owed by schools to

---

[3] We presume that Milton High School Board is still a party to this action. It was not docketed as a party here because it was not referenced in filings made by the parties. However, a review of the trial court docket entries reveals it was a named defendant on the negligence claim.

[4] The trial court granted summary judgment to defendants on the VPAA claim, and plaintiffs have not appealed this aspect of the court's decision, so we will not address it here.

their students. According to plaintiffs, claims grounded in negligent supervision of students only require a showing that an unreasonable risk was foreseeable to the school. Liability is not further limited by § 834(b). Finally, plaintiffs contended that foreseeability is a jury issue and that testimony by plaintiffs' two expert witnesses would establish for the jury that, given the high number of incidents of school hazing nationwide, particularly by athletic teams, Jordan's 2011 assault was foreseeable based upon all the information Milton High School had available to it at that time.

¶ 8. Citing Edson v. Barre Supervisory Union No. 61, the trial court held that Milton High School owed Jordan a duty of ordinary care to prevent him from being exposed to an unreasonable, foreseeable risk. 2007 VT 62, ¶ 10, 182 Vt. 157, 933 A.2d 200. It also concluded that the school had no prior notice of physical harassment by football team members, nor was it aware of Jordan or any other member of the team being harassed by the perpetrators of the assault or anyone else on the team. The court rejected plaintiffs' argument that the school's knowledge of the "no homo" game put it on notice such that the broomstick assault was foreseeable, differentiating between a nonphysical game and a physical attack and noting that the "no homo" game had been discontinued several years prior to Jordan's enrollment. The court ultimately concluded that there was insufficient evidence that the assault was foreseeable, and therefore the school did not have a duty to protect Jordan from it. The court accordingly granted defendants' motion for summary judgment on this claim.

¶ 9. During the discovery process, defendants filed a motion for sanctions alleging that plaintiffs' counsel engaged in ex parte contact with defendants' expert witness. The trial court granted the motion, finding that counsel had acted improperly when he contacted the expert to inquire about scheduling a deposition, and the costs associated with it, without following the customary procedure of going through opposing counsel. The court emphasized that the improper communication resulted in counsel "glean[ing] information that served as the basis for [plaintiffs']

subsequently filed motion to strike" and that defendants were then forced to respond. Ultimately, the court concluded that plaintiffs' counsel acted in bad faith and ordered him to compensate defendants for fees associated with handling and preparing their opposition to the motion to strike.

¶ 10. On appeal, plaintiffs argue that, in ruling on defendants' motion for summary judgment, the trial court failed to give plaintiffs the benefit of all reasonable doubts and inferences as required by Vermont Rule of Civil Procedure 56. Additionally, plaintiffs submit that under these circumstances, Milton High School owed Jordan a heightened duty of care but they also argue in the alternative that the school breached the duty of ordinary care. Finally, plaintiffs take issue with the court's imposition of sanctions on their attorney for his conduct during discovery.

¶ 11. Plaintiffs first argue that when the trial court considered the motion for summary judgment it "disregarded and distorted a number of key material facts well established in the record" and did not consider legal precedent. Plaintiffs take issue with the court's alleged failure to recognize what they argue are undisputed, relevant facts. Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). When determining whether a material fact is disputed, "the party opposing summary judgment is entitled to the benefit of all reasonable doubts and inferences." Carr v. Peerless Ins. Co., 168 Vt. 465, 476, 724 A.2d 454, 461 (1998). We review a grant of summary judgment using the same standard. Greene v. Stevens Gas Serv., 2004 VT 67, ¶ 9, 177 Vt. 90, 858 A.2d 238. We reject plaintiffs' argument that the summary judgment decision must be reversed for a failure to consider certain facts. Even assuming plaintiffs are correct and the trial court disregarded what they characterize as additional material facts and relevant case law, our review is not limited to the facts and law cited by the trial court. We review a summary judgment decision by examining the entire record and decide questions of law de novo. Stone v. Town of Irasburg, 2014 VT 43, ¶ 25, 196 Vt. 356, 98 A.3d 769.

¶ 12.    Plaintiffs next contend that the question of the applicable duty of care is not settled and the trial court erred in not applying a heightened duty of care.  A claim for "[c]ommon law negligence has four elements: a legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a causal link between the breach and the injury."  Demag v. Better Power Equip., Inc., 2014 VT 78, ¶ 6, 197 Vt. 176, 102 A.3d 1101 (quotation omitted).  When applying the most common legal duty, that of ordinary care, "[w]hether a defendant is negligent depends on whether his or her action was objectively reasonable under the circumstances; that is, the question is whether the actor either does foresee an unreasonable risk of injury, or could have foreseen it if he conducted himself as a reasonably prudent person."  Id. ¶ 27 (quotation omitted).  Thus, the scope of the duty "is determined by the foreseeability of the consequences of [the defendant's] acts or omissions."  Id.  While courts have found that a special relationship between the parties dictates the application of a heightened duty of care, under Vermont law there is no special relationship between a school district and its student population.  Indeed, under statutes and our case law, schools owe their students a duty of ordinary care, not a heightened duty of care.

¶ 13.    In 1983, the Vermont Legislature enacted 16 V.S.A. § 834, which provides that:

> (a) Each school district and its employees owe its students a duty of ordinary care to prevent the students from being exposed to unreasonable risk, from which it is foreseeable that injury is likely to occur.
> (b) School districts and their employees do not owe their students a duty of immediate supervision at all times and under all circumstances.

This language is explicit and unambiguous.  Where the Legislature has spoken clearly, we do not interfere.  Lydy v. Trustaff, Inc., 2013 VT 44, ¶ 53, 194 Vt. 165, 76 A.3d 150 (Robinson, J., dissenting) ("[W]here the Legislature has spoken clearly, our obligation is to give effect to its intent—whether it expressed that intent through legislation a year ago, a decade ago, or a century ago."); In re Con-Elec Corp., 168 Vt. 576, 576-77, 716 A.2d 822, 824 (1998) (mem.) (refusing to strike down Liquor Control Board regulation where Legislature has enacted legislation consistent

with regulation). The enactment of § 834(a) evidences the Legislature's intent: Vermont schools do not owe their students anything other than a duty of ordinary care. We will not disregard that intent. In addition, by explicitly stating in § 834(b) that Vermont schools do not owe students a duty of immediate supervision at all times and under all circumstances, we conclude that the Legislature chose not to impose a heightened duty of care upon our schools.

¶ 14. We construed § 834 to determine the scope of the legal duty involving allegations of negligence in the school setting in Edson. 2007 VT 62. There, the plaintiff filed a wrongful death action alleging that the administrators and teachers at her daughter's high school breached their duty of care and supervision when they allowed her daughter to leave school grounds without authorization which, plaintiff submitted, resulted in her murder. The plaintiff invited us to conclude that the duty of care imposed on schools by § 834 is one of "protection against any risk from which it is foreseeable that some type of harm might occur." Id. ¶ 12. We declined to do so and rejected the notion that any potential risk of harm was enough to trigger the duty of care owed by a school. Id. ¶ 13. Instead, we stressed that, "[b]y enacting 16 V.S.A. § 834, the Legislature made clear that the standard of care owed to students is one of only 'ordinary care' and that Vermont schools are neither equipped nor expected to provide constant supervision to students, even those with a troubled history." Id. ¶ 16.

¶ 15. Plaintiffs attempt to support their argument for the application of a duty beyond one of ordinary care by pointing to Jordan's status as a minor student. In Edson, we addressed this argument and held that it did not alter the duty of care. We stated, "Nor did [the school] owe an elevated duty of care to [the student] by virtue of her age, immaturity, or previous indiscretions, as plaintiff suggests." Id. ¶ 15. We recognized that the duty of ordinary care requires schools to take age, circumstances, and a student's disposition into account in exercising reasonable care, but these factors do not raise the duty owed under § 834 beyond one of ordinary care. Id. We have been consistent in this regard. See Baisley v. Missisquoi Cemetery Ass'n, 167 Vt. 473, 480, 708

8

A.2d 924, 928 (1998) (explaining that duty of reasonable person involves, where applicable, taking into consideration children's abilities to protect themselves, their instincts, and their impulses); Bridge v. Woodstock Union High Sch. Dist., 127 Vt. 598, 599, 255 A.2d 683, 684 (1969) (holding that bus driver owed student duty of due care which requires that driver take into account a student's age, situation, and disposition). Jordan's tender age does not mean that Milton High School owed him a heightened duty of care.

¶ 16. The undisputed facts support the conclusion that Milton High School did not breach the duty of ordinary care because the school was not required to protect Jordan against an unforeseeable assault by his teammates. Neither the common law nor § 834 allows the school to be held liable in negligence for injury that a reasonable person could not have foreseen or anticipated under the circumstances. Edson, 2007 VT 62, ¶ 10. The school did not have any knowledge or notice to make the assault foreseeable and, in turn, did not owe Jordan a duty to protect him from it. We acknowledge that the undisputed facts reveal a history of, at the least, inappropriate, and, at times, sexually focused behavior among football team members. But the existence of inappropriate behavior, even, perhaps, hazing, does not guide this analysis; rather, it is the school's complete lack of notice—undisputed on the summary judgment record—that is determinative. Indeed, it is undisputed that the school was unaware of any of this conduct until police began the investigation into Jordan's 2012 death and the 2011 assault that preceded it. This investigation did not occur until Spring 2013.[5] So, the history of team members exposing their genitals to other players, pretending to "hump" teammates, and shoving exposed genitals into other

---

[5] The trial court made a finding that "[a]nother team member, J.B., described an incident in which a team member allegedly held another team member down while a third team member 'stuck something toward his butt.'" However, as with the rest of the record of inappropriate behavior, harassment, and abuse by members of the football team, there is no evidence that the school was made aware of this until police began investigating the instant assault in 2013. We, therefore, do not consider the incident when determining whether the 2011 assault on Jordan was foreseeable.

9

players is not relevant to the foreseeability analysis here because the school was never made aware of this behavior until long after Jordan was assaulted, when interviewees finally made these reports to investigators.

¶ 17. Furthermore, we have held that, "[i]n general, crimes committed by a third party fall within the realm of the unforeseeable, and therefore cannot form the basis for liability." Id. ¶ 13. We have qualified this general rule when the defendant had special knowledge or notice which would allow it to anticipate the wrongful act. Estate of Sumner v. Dep't. of Soc. & Rehab. Servs., 162 Vt. 628, 629, 649 A.2d 1034, 1036 (1994) (mem.) (holding Department of Social and Rehabilitative Services could be held liable for abuse of sisters when it had duty to anticipate their sexual abuse by stepfather). Here, it is undisputed that Milton High School had no knowledge of prior inappropriate physical behavior, directed at Jordan or any other student, by the perpetrators of the assault. In 2011 the school could not have reasonably anticipated a physical assault, having had no indication that a physical act like this might occur involving Jordan or the perpetrators. Therefore, the duty of ordinary care did not require the school to protect him from it.

¶ 18. Plaintiffs maintain that the school's discovery that students and football team members played the "no homo" game in 2009 made the broomstick assault on Jordan foreseeable. We disagree. It is perhaps foreseeable in the dictionary sense of that word—albeit unfortunate— that high school students will conduct themselves inappropriately by engaging in any number of verbal and physical behaviors. However, knowledge that students, including football team members, are making homophobic comments to each other, with no accompanying physical contact, did not put Milton High School on notice, by making it foreseeable, as that term is used in tort law, that two of its students would forcibly assault another. Indeed, the New York Supreme Court, Appellate Division, considered similar circumstances in an action brought by a high school student against a school district to recover for an assault committed by a fellow student in the school cafeteria. Sanzo v. Solvay Union Free Sch. Dist., 750 N.Y.S.2d 252, 253 (App. Div. 2002)

10

(mem.). The appellate court held that the trial court erred in denying the school district's motion for summary judgment because, even though the school principal "was aware of verbal taunting" between the plaintiff and his assailant, the school had no knowledge of any prior "violent or threatening behavior" between the two "that 'would or should have forewarned the School District' of the assault." Id. (quoting Hanley v. Hornbeck, 512 N.Y.S. 2d 262, 264 (App. Div. 1987)). The verbal conduct associated with the "no homo" game did not suffice to put Milton High School on notice of the potential for a physical assault.

¶ 19. We also reject plaintiffs' argument, which they support with the proposed testimony of expert witnesses, that a nationwide epidemic of school hazing and harassment contributed in making the assault on Jordan foreseeable.[6] We considered this issue in Edson when plaintiff argued that the " 'concept of foreseeability refers to generalized risks of the type of incidents and injuries that occurred rather than predictability of the actual sequence of events.' " 2007 VT 62, ¶ 12 (quoting Fazzolari v. Portland Sch. Dist., 734 P.2d 1326, 1338 (1987)). We distinguished the facts in Edson from those in Fazzolari. In Fazzolari, the Supreme Court of Oregon held that "school officials' [knowledge] of a generalized risk of sexual assault in the vicinity of [a] school[,]" based on a previous sexual assault that occurred on school grounds and reports of others, made a subsequent sexual assault foreseeable. 2007 VT 62, ¶ 14; Fazzolari, 734 P.2d at 1338. In contrast, we noted in Edson that the Vermont school "did not have the requisite knowledge or notice" of the risk of a premeditated murder and that "[t]here was no allegation that [the school] 'was or should have been aware of such criminal conduct perpetrated near its campus.' " 2007 VT 62, ¶ 14. Thus, we held that, "[a]bsent more specific notice of the impending crime, [the school] had no legal duty to, and in all practicality could not, prevent [plaintiff's

_____

[6] Defendants argue that the reports produced by the expert witnesses did not meet the summary judgment standard requiring that the statement of undisputed facts be supported by admissible evidence pursuant to V.R.C.P. 56(c)(1)(B) and (c)(2). We consider these expert opinions on appeal in order to resolve the argument made by plaintiffs.

daughter's] death." Id. In summary, we have recognized that a generalized risk can contribute to establishing foreseeability, but only when it is accompanied by some knowledge of specific, similar acts or incidents of harm. That is not the case here. As we have explained, the playing of the "no homo" game did not put Milton High School on notice of the subsequent criminal, forcible act of assault. And there was no other conduct of which the school was aware at the time of the assault in 2011 that would have put it on notice. Thus, we agree with other jurisdictions that a generalized knowledge of harassment and hazing on other school campuses, without more, is not sufficient evidence of foreseeability. See Mirand v. City of New York, 637 N.E.2d 263, 266 (N.Y. 1994) ("Actual or constructive notice to the school of prior similar conduct is generally required because, obviously, school personnel cannot reasonably be expected to guard against all of the sudden, spontaneous acts that take place among students daily . . . ."); Whitfield v. Brd. of Educ., 789 N.Y.S.2d. 188, 189 (App. Div. 2005) (holding that claim for failure to provide adequate supervision requires showing that school authorities had sufficiently specific knowledge or notice of dangerous conduct which caused injury); Williams v. United Pentecostal Church Int'l, 115 S.W.3d 612, 615-16 (Tex. Ct. App. 2003) (rejecting argument that generalized knowledge of prevalence of abuse of children in church setting satisfies foreseeability requirement in claim of sexual abuse of children by pastor).[7]

¶ 20.  We hold that summary judgment is appropriate here where the undisputed facts fail to demonstrate that Milton High School had sufficiently specific knowledge of prior conduct by football team members such that a forcible assault was foreseeable. Where the assault was not foreseeable, the school had no duty to protect Jordan from it. Furthermore, the summary judgment

---

[7] We disagree with the dissent that expert conclusions—based on information from other locations—can make the duty of reasonable care a jury issue. This would undermine the Court's reasoning in Edson that generalized risks alone are not enough. Our holding protects Vermont schools from second-guessing where no school official had a whiff of warning that a problem existed. And, it continues to require schools to appropriately address problems as they come to light.

12

record does not support the argument that the school breached the duty of ordinary care. Contrary to plaintiffs' argument that the issue of foreseeability belongs before a jury, "[s]ummary judgment is appropriate when the record before the court clearly shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Gilman v. Me. Mut. Fire Ins. Co., 2003 VT 55, ¶ 7, 175 Vt. 554, 830 A.2d 71.

¶ 21.  Finally, plaintiffs argue that the court erred in granting defendants' motion and imposing sanctions on their attorney. We review a trial court's imposition of sanctions for abuse of discretion. State v. Mears, 170 Vt. 336, 345, 749 A.2d 600, 607 (2000). We will uphold the ruling "unless the court's discretion was either totally withheld or exercised on grounds clearly untenable or unreasonable." Id. (quotation omitted). The trial court did not err when it determined that plaintiffs' attorney knowingly violated Vermont Rule of Civil Procedure 26(b)(5)(A)[8] and acted in bad faith by using the information he had obtained to file a motion to strike, causing defendants to have to respond and incur legal fees.

¶ 22.  At a hearing on the motion for sanctions, plaintiffs' attorney conceded that he had purposefully contacted defendants' expert witness in order to schedule and determine the costs of a deposition of the expert. He also agreed that this email communication resulted in the witness making a substantive statement which counsel believed was inconsistent with defendants' expert witness disclosure. Counsel then used this communication in support of a motion to strike. Defendants incurred costs in responding to the motion.[9] The trial court relied on V.R.C.P. 26(b)(5)(A)(i)-(iii) in concluding that the discovery rule provides only limited discovery of an

_____

[8] Rule 26 was recently amended to add a subsection. As a result, subsequent subsections were renumbered, including the subsection relevant here. At the time of the trial court's decision, the relevant subsection was numbered as V.R.C.P. 26(b)(4)(A). Reporter's Notes—2017 Amendment, V.R.C.P. 26. We refer to the Rule by its current numbering for convenience.

[9] In its order imposing sanctions, the trial court did not identify the amount of the reimbursement and only identified it as "the cost of preparing and handling the[] opposition to Plaintiff's motion to strike."

opposing party's expert witness through interrogatories, depositions, and the production of reports or written opinions, serving to prohibit ex parte communication between the expert witness and opposing counsel. Noting that Vermont's expert witness discovery rule is patterned after the analogous federal rule, the court cited American Bar Association Formal Opinion 93-378, which states: "Although the Model Rules do not explicitly prohibit ex parte contacts with an opposing party's expert[,] . . . a lawyer who [does so] may violate Model Rule 3.4(c) if the matter is pending in . . . a jurisdiction that has adopted [a] rule patterned after Federal Rule of Civil Procedure 26(b)(4)(A)." The court found that counsel could and should have scheduled the deposition and determined its cost by contacting opposing counsel in the customary manner and that defendants were prejudiced by the ex parte contact by being forced to respond to the motion to strike. The court concluded that plaintiffs' counsel acted in bad faith and ordered him to compensate defendants for the costs of responding to the motion. See Lawson v. Brown's Home Day Care Ctr., Inc., 2004 VT 61, ¶ 14, 177 Vt. 528, 861 A.2d 1048 (mem.) (holding that court may sanction attorneys for misconduct through its inherent powers but finding of bad faith must precede any sanction based upon court's inherent powers).

¶ 23. The trial court did not abuse its discretion in sanctioning counsel by requiring him to compensate defendants. While counsel initially reached out to the expert for the purposes of scheduling a deposition and assessing related costs, this communication resulted in the expert making comments about the substance of his professional opinion. Rather than contacting defense counsel to work toward the scheduling of a deposition, which is customary, plaintiffs' attorney contacted the expert witness directly, without notice to defense counsel. Rule 26(b)(5)(A) sets limits on an attorney's contact with an opposing party's expert witness, and these traditional methods were not followed. It is even more egregious that when counsel learned substantive information from the expert, he did not immediately contact defense counsel to alert him that he had been told something he believed was contrary to the expert witness disclosure. Instead,

counsel used the ill-gotten information as ammunition to file a motion to strike the expert witness. The court did not abuse its discretion in finding that counsel acted in bad faith during this combination of events and in ordering counsel to compensate defendants for their costs.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 24. **ROBINSON, J., dissenting.** The majority's decision usurps the role of the factfinder in determining the applicable standard of care in the face of conflicting claims, and it ignores expert testimony and statutory directives. For these reasons, I respectfully dissent.

¶ 25. I agree with the majority that the standard of care applicable to plaintiffs' common law negligence claim is one of ordinary care. See ante, ¶¶ 12-15. But in assessing whether defendants breached that standard, the majority analyzes this case as if plaintiffs are only claiming that defendants had sufficient notice of the risk that Jordan would be assaulted by his teammates to trigger a generalized duty to protect him from this injury. The majority doesn't adequately grapple with plaintiffs' broader argument that defendants failed to establish and administer a hazing prevention and enforcement program that met the applicable standard of care, and that Jordan's injuries resulted from that failure.

¶ 26. Below, I lay out the considerable evidence plaintiffs proffered to support this legal theory. Based on this evidence, I would reverse because the question of negligence is ordinarily one for the jury. Expert testimony, as well as a statutory presumption, support plaintiffs' claim that defendants breached an applicable standard of conduct. The majority's focus on foreseeability, relying largely on cases addressing the foreseeability of a particular harm wrought

15

by a third party, misses the fact that the harm Jordan suffered is exactly the kind of harm anticipated by the standard of care described by plaintiffs' experts and codified in statute.

¶ 27. Plaintiffs relied on two expert reports to support their claim that defendants' policies and practices concerning hazing prevention, detection, and enforcement fell below the standard of ordinary care applicable to high schools in Vermont.

¶ 28. The first, Norman J. Pollard, was Dean of Students and Interim Assistant Vice President of Student Affairs at a university in New York. In his report, he represents that he has expertise in the field of hazing through research, education, and experience. He was principal investigator in two national landmark surveys of hazing, serves on the board of a national hazing prevention organization, has been a featured speaker on hazing prevention to various national collegiate and secondary school associations, and has consulted with several university and high school athletic departments, including University of Vermont, concerning their hazing prevention programs. Dr. Pollard's opinion rests on a thorough review of defendants' hazing policy, their implementation of that policy, Vermont laws relating to hazing, a resolution of the National Federation of High Schools (NFHS) concerning hazing, and recommendations by hazing prevention specialists for high school personnel and administrators.

¶ 29. Dr. Pollard opined that the record provided no evidence of defendants' compliance with Vermont state hazing law, NFHS's guidelines, or Milton High School's own hazing policies and procedures for education, prevention, investigation, and adjudication. Had defendants implemented industry-standard hazing-prevention practices and basic supervision, they would have been aware of the culture of hazing that ran rampant within the football program. Dr. Pollard noted that none of the staff or players acknowledged receiving any significant training or guidance in how to prevent hazing on athletic teams. He explained that:

> Based on the information in the provided materials, the administrators and coaches either did not fulfill the NFHS obligation to educate the membership on areas of hazing or they did such a

16

poor job that it was not remarkable. Either way, the Milton High School administration never followed through to confirm compliance.

He further indicated that if the athletic department ever required a preseason meeting to discuss the school's policy and prohibition against hazing, it wasn't memorable or effective. The school cursorily developed manuals, forms, and lists, he noted, but it did little to no assessment or follow-up to ensure the information was retained and implemented. And defendants did not implement standard risk management strategies until several years *after* the events at issue here.

¶ 30. The second expert, Susan Lipkins, was a psychologist and expert on hazing. Dr. Lipkins wrote a book, <u>Preventing Hazing: How Parents, Teachers and Coaches Can Stop the Violence, Harassment, and Humiliation</u>; has appeared on over 100 radio and television programs; has been quoted or published in multiple newspapers and magazines of national stature; and has educated students and administrators on hazing issues. In evaluating this case, she reviewed defendants' policy, Vermont state law, and the case record.

¶ 31. Like Dr. Pollard, Dr. Lipkins opined that, by the fall of 2011, defendants failed to implement appropriate hazing education, prevention, and intervention strategies. Dr. Pollard identified twenty-seven ways in which defendants failed to meet the applicable standard of care. Among other things, she asserted that defendants had failed to define hazing; disseminate a policy relating to hazing and sexual harassment; provide education or training on hazing and sexual harassment to coaches, administrators, teachers, students, parents, or other district employees; train and designate specific personnel to process relevant information and make appropriate decisions; provide multiple, confidential, and anonymous methods to report hazing or sexual harassment; follow guidelines issued by the United States Department of Education; and comply with Vermont statutory standards concerning hazing.

¶ 32. Given this evidence, there is no reason to depart from the general rule that the applicable standard of care and breach thereof are questions for the jury. Plaintiffs' expert

testimony creates a dispute of fact as to the applicable standard of care, and is reinforced by a statutory presumption. This dispute is sufficient to defeat summary judgment for defendants. The majority's focus on the foreseeability of decedent's injury is misplaced given the purpose of the standards articulated by plaintiffs' experts and reinforced by statute.

¶ 33. The question of negligence—what the applicable standard of care requires and whether the defendant met that standard—is ordinarily a jury question. See Morway v. Trombly, 173 Vt. 266, 275, 789 A.2d 965, 971 (2001) ("Summary judgment is not appropriate in situations involving facts that leave some doubt as to whether a reasonable jury would find the defendant negligent. Particularly where there is no settled rule of diligence more specific than a general reasonableness standard, 'negligence is ordinarily a question for the jury.' " (quoting Baisley v. Missisquoi Cemetery Ass'n, 167 Vt. 473, 480, 708 A.2d 924, 928 (1998))). As this Court has previously explained:

> Where the law has settled no rule of diligence, negligence is ordinarily a question for the jury and it is a fact to be inferred from the attending circumstances. It can be ruled as a matter of law only, where the facts are undisputed and are so conclusive that but one reasonable inference can be drawn therefrom. If the evidence justifies opposing inferences, the question is always for the jury.

LaFaso v. LaFaso, 126 Vt. 90, 96, 223 A.2d 814, 819 (1966); see also Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 8(b) (2010) ("When, in light of all the facts relating to the actor's conduct, reasonable minds can differ as to whether the conduct lacks reasonable care, it is the function of the jury to make that determination"); Restatement (Second) of Torts § 285, Reporter's Notes (1965) (explaining that if no standard of conduct has been established by statute or court ruling on substantially identical facts, unless jury could not reasonably find defendant's conduct to be negligent, jury's role encompasses defining standard of care as applied to facts before it).

18

¶ 34.     Plaintiffs' expert testimony that defendants' hazing prevention and enforcement policies fell below the prevailing standard of ordinary care is entirely appropriate in this context and was sufficient to create a dispute as to the applicable standard of care.

¶ 35.     Where standard of care involves specialized knowledge, expert testimony can help the jury determine the standard of care.  V.R.E. 702; see also id. Reporter's Notes ("As to the necessity of expert testimony, the rule is permissive only—such testimony may be heard when it will assist the trier.").  Expert testimony can provide the jury with a framework for evaluating a claim.  For example, the U.S. Court of Appeals for the Eighth Circuit considered a plaintiff's negligence claim against a retailer for injuries the plaintiff suffered when he fell on a puddle of undiluted liquid hand soap in a public restroom.  Ray v. Wal-Mart Stores, Inc., 120 F.3d 882 (8th Cir. 1997).  The retailer appealed the trial court's admission of expert testimony that the retailer's bathroom inspection program was inadequate and inferior to industry standards.  The Eight Circuit explained that the "testimony offered the jury a framework to assess whether [the retailer] breached its duty of care to its customers."  Id. at 885; see also Haskenhoff v. Homeland Energy Sols., LLC, 897 N.W.2d 553, 600-01 (Iowa 2017) (affirming admission of expert testimony of human resources professional concerning standard of practice for employers with respect to prevention of sexual harassment and enforcement of sexual harassment policies).[10]

_____

[10]    In some cases, expert testimony is required to establish the standard of care.  See, e.g., Taylor v. Fletcher Allen Health Care, 2012 VT 86, ¶ 9, 192 Vt. 418, 60 A.3d 646 (explaining that because "the human body and its treatment are extraordinarily complex subjects requiring a level of education, training and skill not generally within our common understanding," medical malpractice plaintiffs must generally support their claims with expert testimony unless "the violation of the standard of medical care is so apparent to be comprehensible to the lay trier of fact" (quotations and alterations omitted)); Estate of Fleming v. Nicholson, 168 Vt. 495, 497, 724 A.2d 1026, 1028 (1998) (noting that expert testimony on standard of care generally required to support legal malpractice claim unless lack of care is so apparent that only common knowledge and experience are needed to comprehend it); see also Davis v. Bud & Papa, Inc., 885 F. Supp. 2d 85, 88 (D.D.C. 2012) (noting that in cases involving crowd control and public safety, courts have often required expert testimony to define requisite standard of care).  I do not contend that expert testimony is required to support plaintiffs' claims in this case, but do believe that given the

19

¶ 36.     Plaintiffs' evidence on this point is sufficient to create a material dispute, defeating summary judgment.  The non-moving party is entitled to all reasonable doubts and inferences on a motion for summary judgment.  Provost v. Fletcher Allen Health Care, 2005 VT 115, ¶ 15, 179 Vt. 545, 890 A.2d 97.  In Provost, this Court read an expert affidavit broadly to infer the applicable standard of care, even when the expert affiant had not expressly articulated that standard.  Id. ¶ 13 (noting that "better practice is for the affiant to expressly articulate the standard of care," but nevertheless inferring standard of care from affiant's narrative).  We explained that summary judgment is improper where the evidence is subject to conflicting interpretations and emphasized that "it is not for the trial judge to adjudicate who is more credible, plaintiff or defendants and their affiants, in the context of a motion for summary judgment."   Id. ¶ 15 (quotation omitted). Responding to critiques of the plaintiff's expert affidavit, we noted that the doctor's "expert affidavit does more than make bare allegations.  It lays out a theory of the case to be developed at trial."  Id. ¶ 16.  The expert affidavits in this case are far more explicit and comprehensive than the affidavit at issue in Provost.  The jury may ultimately conclude that the standard of care described by plaintiffs' experts is more exacting than the duty of ordinary care, but plaintiff's expert testimony is sufficient to create a dispute as to the standard of care and defendants' breach thereof.

¶ 37.     This expert evidence as to the standard of care for secondary schools is not tied to a specific geographical location; it describes the duties of all secondary schools.  Any suggestion that the standard of ordinary care in Vermont is for some reason less exacting than the standard applicable across the country is belied by Vermont statutes requiring schools to implement anti-hazing policies meeting certain criteria—criteria plaintiffs' experts have opined defendants failed to meet.  These statutes not only reinforce the expert testimony proffered by plaintiffs; evidence

relatively specialized nature of administering a school and overseeing sports programs, expert testimony is a permissible way to help the jury determine the standard of care.

of defendant's failure to comply with the statutory requirements itself should defeat summary judgment for defendant.

¶ 38. We have recognized that a safety statute may serve as rebuttable evidence that the defendant breached the applicable standard of care, thereby shifting the burden of production to the defendant. See Bacon v. Lascelles, 165 Vt. 214, 222, 678 A.2d 902, 907 (1996) (explaining that "proof of a violation of the safety statute creates a prima facie case of negligence" that "raises a rebuttable presumption of negligence and shifts the burden of production to the party against whom the presumption operates"). We have adopted the Restatement (Second) of Torts § 286 (1965), "which defines the elements of a safety statute or regulation" that may establish the standard of care. Dalmer v. State, 174 Vt. 157, 164, 811 A.2d 1214, 1222 (2002). Under the Restatement, the statute or regulation must have been intended to protect the class of persons to which the plaintiff belongs "against the particular hazard and harm that result[ed]." Restatement (Second) of Torts § 286(a)-(d).

¶ 39. The Legislature has passed various anti-harassment and anti-hazing statutes to protect students from harassment and hazing in our schools. One provision required each public school to "adopt and implement a comprehensive plan for responding to student misbehavior," including "[a] description of behaviors on and off school grounds that constitute misconduct, including harassment, bullying, and hazing particularly those behaviors that may be grounds for expulsion." 16 V.S.A. § 1161a(a)(6); see also 16 V.S.A. § 570(b) (effective May 2012) (requiring school boards to "develop, adopt, ensure the enforcement of, and make available in the manner described [by statute] harassment, hazing, and bullying prevention policies at least as stringent as model policies developed by [the Secretary of Education]"). These statutes, targeted at Vermont's elementary and secondary schools, are intended to protect students from bullying, harassment, and hazing—exactly the harm that befell Jordan. For that reason, the requirements of these statutes are rebuttably presumed to reflect standards of care for purposes of a common law negligence

21

claim. This reinforces the genuine dispute of fact as to the standard of care, and defendants' breach thereof, arising from plaintiffs' experts' opinions.

¶ 40. In the face of this expert evidence, the majority's focus on the foreseeability of the particular assault, or the lack of notice to defendants of ongoing hazing issues on the football team, is misplaced. Our decision in Edson that a school is not liable in negligence for an attack on its student by a third party that could not have been reasonably foreseen is unremarkable and inapposite. 2007 VT 62. In that case, the Court concluded that murder of a student by a third party unconnected with the school after the student voluntarily left school grounds without permission was not sufficiently foreseeable under the circumstances of that case to support a claim of negligence against the school. Id. ¶ 13. The standard of care asserted in this case does not arise from some generalized duty to protect Jordan from this particular assault—a duty that necessarily requires notice of a threat lest it morph into strict liability. And the assault in this case was student-on-student, on school grounds; it was not perpetrated by a stranger to the school, off campus. Per plaintiffs' experts, the duty of ordinary care in the context of school administration requires that defendants implement proactive measures to train faculty, staff, and students about hazing; provide multiple effective mechanisms for reporting concerns; and affirmatively evaluate sports teams' cultures in the face of a widespread practice of hazing-like behavior (the "no homo" game in 2009). These duties do not depend on notice of a particular threat, whether individualized or teamwide. These are duties that, per plaintiffs' experts, applied to defendants based on professional standards and statutory requirements without regard to actual notice of any specific, ongoing issues in the football program. By contrast, a ruling that defendants are not liable unless they had actual notice of threats to Jordan or others generally in the football program would encourage school administrators to remain ignorant of issues concerning harassment and hazing at their schools, rather than to proactively seek to prevent such threats.

22

¶ 41. The relevant foreseeability in this case is tied to the defendants' failure to implement adequate hazing programs, not their failure to respond to particular threats of which they had notice. The injury Jordan suffered is exactly the kind of injury that is a reasonably foreseeable consequence of a failure to implement adequate hazing programs pursuant to the standard of care described by plaintiffs' experts and codified in state statute.

¶ 42. The majority has overridden this expert testimony on a factual question with its own legal ruling. In doing so, the majority has failed to consider the evidence and inferences to be drawn therefrom in the light most favorable to plaintiffs, has taken the question of the applicable standard of care from the jury, and has apparently established a rule of law that essentially immunizes schools from liability for injuries arising from their failure to meet statutory or professional standards of care relative to the content and implementation of anti-hazing and anti-harassment policies.

¶ 43. For the above reasons, I dissent.

¶ 44. I am authorized to state that Chief Justice Reiber joins this dissent.

_____
Associate Justice