Filed 11/16/23

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

|  |  |
|---|---|
| MICHAEL D. MARINEAU,<br> Plaintiff<br><br>v.<br><br>ROMAN CATHOLITIC DIOCESE OF<br>BURLINGTON, VERMONT,<br> Defendant | Docket No. 570-7-19 Cncv |

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff brings this action against the Roman Catholic Diocese of Burlington related to allegations of child sexual abuse by a priest—Father Alfred Willis—in 1976 and 1977 when Plaintiff was a child and altar boy at St. Augustine's Parish in Montpelier. Plaintiff asserts claims for civil conspiracy (Count I), breach of fiduciary duty (Count III), negligent supervision (Count IV), failure to prevent harm (Count VI), and intentional infliction of emotional distress (Count VII).[1] The Diocese moves for summary judgment on all claims.

### Undisputed Facts

Alfred Willis was ordained a Diocese priest on June 18, 1976. That same month, the Diocese appointed him as Assistant Pastor of St. Augustine's Parish in Montpelier. For a period spanning 1976 through 1977, Willis sexually abused Plaintiff in four different locations over an eight-month period: (1) on a camping trip with two of Plaintiff's friends;

---

[1] Plaintiff has withdrawn his fraud claim (Count II). *See* Pl.'s Opp'n at 1. The court previously dismissed Count V (fostering an abusive environment). *See* Ruling on Mots. to Dismiss (June 9, 2020) and Entry Regarding Motion (Sept. 10, 2020).

(2) in the attic at a friend's house; (3) in the bathroom at a friend's house; and (4) at St. Augustine's Parish. See Def.'s Statement of Facts ¶ 5; Pl.'s Statement of Facts ¶¶ 243–46.

Plaintiff did not report the abuse to any Diocese official when it happened. Def.'s Statement of Facts ¶ 24. The first person Plaintiff told about the abuse was a therapist in 1988. Id. ¶ 25. After that, he did not discuss the abuse with anyone until 2019. Id. Plaintiff never spoke to the bishop or any other members of the Diocese about Willis, and no one at the Diocese spoke to Plaintiff about the priests he would be serving for before he started as an altar boy.

There are no records currently in Diocese files reflecting that the Diocese had received any complaints or reports of child sexual abuse or other child misconduct concerning Willis prior to Willis's assignment to St. Augustine's Parish. There are also no records reflecting any complaints or reports concerning Willis made to the Diocese between the date of Willis's ordination and the end of 1977. However, it is clear that Willis's personnel file is no longer complete. He was terminated from the church in 1985 and other than the record of that termination, his file was destroyed 10 years later.[2]

Plaintiff seeks compensatory and exemplary damages from the Diocese for his alleged physical and emotional injuries caused by the abuse.

<u>Discussion</u>

I.      <u>Negligent Supervision (Count 4)</u>

Plaintiff alleges that the Diocese was grossly negligent in its hiring and supervision of Willis, thus enabling Willis to sexually abuse Plaintiff and other children. The Diocese

---

[2] Additional facts, such as whether the Diocese had notice of prior instances of abuse by other priests, are discussed later in this decision.

contends that Willis's abuse of Plaintiff was not foreseeable. In Vermont, a negligent

supervision claim is based on § 213 of the Restatement (Second) of Agency:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless . . . in the employment of improper persons or instrumentalities in work involving risk of harm to others: in the supervision of the activity; or . . . in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Haverly v. Kaytec, Inc., 169 Vt. 350, 356–57 (1999) (quoting Restatement (Second) of

Agency § 213 (1958)).[3] Under the Restatement, "liability exists only if all the requirements

of an action of tort for negligence exist." Id. at 357 (citing Brueckner v. Norwich Univ.,

169 Vt. 118, 126–27 (1999). In a negligence claim, "the foreseeability of the harm" is an

important factor in determining whether a duty of care exists. Deveneau v. Wielt, 2016

VT 21, ¶ 8, 201 Vt. 396; Dobbs, The Law of Torts § 256 (2d ed.) ("A defendant whose

conduct causes harm to another is not ordinarily responsible in tort unless a reasonable

person in his position would have recognized the risk of harm. This means that liability is

not imposed unless harm would have been foreseeable to a reasonable person.").

Plaintiff alleges that the Diocese was "grossly negligent in its hiring and

supervision" of Willis because he "had previously been credibly accused of child sex

---

[3] Plaintiff contends that the court should apply the Restatement (Third) of Agency § 7.05 instead of the Restatement (Second) of Agency § 213, based on references to the Third Restatement in several recent Supreme Court decisions. Pl.'s Opp'n at 20–22. Plaintiff similarly suggests that the negligent supervision cases relied upon by the Diocese are inapplicable here because they pre-date "the adoption by Vermont courts" of the Third Restatement. Id. at 21 n.3. The court concludes that the result here today would be no different under the Third Restatement and thus does not address this question. As the court observes later in this ruling, however, the fact that our Supreme Court has not expressly adopted § 7.05 does not suggest that this court cannot look to it as the latest statement of the law.

3

abuse." Def.'s Statement of Facts ¶ 33; Am. Comp. ¶¶ 355, 370.[4] Plaintiff has presented no evidence, however, that Willis had been accused of any misconduct prior to 1976–1977, when he allegedly abused Plaintiff. Nor is there any evidence that the Diocese had notice that Willis specifically posed a risk of abuse to children prior to 1977. *See* Def.'s Statement of Facts ¶¶ 3, 4, 56. Plaintiff attempts to manufacture a dispute on this issue through numerous arguments and objections, but those attempts fail.

First, the McDermott affidavit is permissible under Rule 56(c)(6) because it is based on personal knowledge, sets out facts that would be admissible if McDermott testified, and shows that McDermott is competent to testify on the matters stated. In his position as Diocese chancellor, Monsignor McDermott is responsible for maintaining Diocese personnel records, and his assertion that there were no complaints about Willis's conduct before 1977 is based on his personal review of those records. *See* McDermott Aff. ¶¶ 1–5. While McDermott's affidavit overstates what he can actually say—i.e., that there were never any complaints before 1977 to anyone in the Diocese—it does establish that the existing records reflect no such complaints.[5] The Diocesan records upon which the

---

[4] For purposes of brevity, the court refers to Plaintiff's "First Amended Complaint – Revised" as simply the "Amended Complaint" or "Am. Compl."

[5] McDermott states that, before 1977, "the Diocese had not received any complaints or reports of child sexual abuse or other misconduct involving children concerning Alfred Willis" and, similarly, that "there were no complaints or reports of child sexual abuse or other misconduct involving children concerning Alfred Willis made to the Diocese." McDermott Aff. ¶¶ 5(b) and (c). Obviously, these statements go too far, because McDermott cannot know if complaints were made outside of Diocese records or if records that contained such complaints were destroyed before he became Diocese chancellor. Notably, the Diocese admits that most of Willis's personnel file was destroyed in 1995 pursuant to Canon Law, so it clearly cannot say that there were no pre-1977 complaints in his file at one time. Nevertheless, his affidavit establishes that the *existing records reflect no such complaints.*

In his Sur-Reply, Plaintiff contends that in the Diocese's objections to a Rule 30(b)(6) deposition notice, the Diocese "conceded" that McDermott lacks personal knowledge as to the "historical facts" in his affidavit. Pl.'s Sur-Reply at 5. Not so. In those objections, the Diocese merely noted that there would be "significant limitations" on the scope of McDermott's knowledge on the topic of "[t]he completeness of the Priest Documents" prior to 2005 "given the passage of substantial time and the death and/or cognitive

affidavit is based also qualify as business records under V.R.E. 803(6) and V.R.E. 902(11). *See* Second McDermott Aff. ¶ 3 (specifically addressing requirements of those rules). Plaintiff offers no support for his suggestion that McDermott cannot attest to Diocesan practices before his ordination in 1989.

The affidavit establishes that there is no record of complaints about Willis before 1977, which Plaintiff does not dispute. Thus, the Diocese has met its summary judgment burden to demonstrate the absence of evidence on that point. V.R.C.P. 56(c)(1). If Plaintiff wants to argue that there were complaints made outside of the documents provided to the Diocese, it is his burden to prove that with admissible evidence. *See* Boulton v. CLD Consulting Engineers, Inc., 2003 VT 72, ¶ 5, 175 Vt. 413 ("[T]he moving party . . . may satisfy its burden of production by showing the court that there is an absence of evidence in the record to support the nonmoving party's case. . . . The burden then shifts to the nonmoving party to persuade the court that there is a triable issue of fact.") (quotation omitted). To that end, Plaintiff argues that Willis's "Definitive Sentence," the document that removed Willis from the Diocese's employment, indicates that there were complaints of sexual misconduct made to the Diocese before 1977. Pl.'s Resp. to Def.'s Statement of Facts ¶ 3; Pl.'s Statement of Facts ¶ 101.

The Definitive Sentence describes how the Rector of the seminary where Willis had studied from 1972 to 1975 conveyed to the Diocese that there "might be a problem" with Willis "in regard to alleged homosexual conduct." Ex. 89 at 1 (Definitive Sentence). However, the same Rector then informed the Diocese that the investigation "failed to reveal substance to this concern" and "asked that the matter be dropped." Id. (quotation

---

impairment of those who had personal knowledge of the facts pertaining to this topic." Ex. 1 to Sur-Reply, ¶ 2. As the Diocese's records custodian, McDermott plainly has personal knowledge sufficient to testify about the Diocese's records practices and what is in the priests' personnel files.

omitted). Moreover, this report indicates nothing more than consensual sexual conduct with other adults. To infer that the "alleged homosexual conduct" involved child sexual abuse would be pure speculation and conjecture. *See* Boyd v. State, 2022 VT 12, ¶ 19 (defendant entitled to summary judgment where jury could find for plaintiff based only on speculation or conjecture). Consensual sexual activity with other adults does not evince a propensity to abuse children. *See* Roman Cath. Bishop v. Superior Ct., 50 Cal. Rptr. 2d 399, 405 (Cal. Ct. App. 1996) ("Even if the church had learned of [priest's] prior sexual affairs with adults, it is illogical to conclude the church should have anticipated [priest] would commit sexual crimes on a minor."); L.L.N. v. Clauder, 563 N.W.2d 434, 446 (Wis. 1997) (Diocese's constructive knowledge that hospital chaplain "may again have consensual sexual relations with a single, adult, non-patient" did not put Diocese on notice that chaplain was "likely to abuse his position as chaplain to engage vulnerable patients in sexual intercourse"). And of course, the fact that Willis abused other Diocese boys and was accused of child sexual abuse after 1977 is not relevant to whether the Diocese had notice of that before 1977.

Plaintiff also seeks an adverse inference based on the Diocese's destruction of Willis's personnel file in 1995. Specifically, Plaintiff asks the court to preclude the Diocese from introducing evidence of a lack of notice in Willis's file. Pl.'s Opp'n at 5. The destruction of evidence relevant to the proof of an issue at trial may support an inference that "the evidence would have been unfavorable to the party responsible for its destruction." Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001) (quoting Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998)); *accord* In re Campbell's Will, 100 Vt. 395, 403 (1927). There are essentially three purposes to the spoliation doctrine:

> (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation.

Byrnie, 243 F.3d at 107. To be entitled to a spoliation remedy, Plaintiffs must show (1) that the Diocese had an obligation to preserve Willis's personnel file at the time it was destroyed; (2) that the file was destroyed "with a culpable state of mind"; and (3) that a reasonable jury could find that the destroyed file was relevant to, and would have supported, Plaintiff's claims. Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 107 (2d Cir. 2002).

Absent a statutory provision, "[t]here is a common law 'duty to preserve documents . . . based on the existence of pending, threatened, or reasonably foreseeable litigation.'" The Cincinnati Ins. v. Plouffe, No. 235-4-18 Wncv, 2021 WL 4189802, at *3 (Vt. Super. Ct. July 27, 2021) (Bent, J.) (quoting Spoliation of Evidence ch. 1 (3d ed. 2013)). "When litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a [trial] court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." Micron Tech., Inc. v. Rambus Inc., 645 F.3d 1311, 1320–21 (Fed. Cir. 2011) (citing Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001)). While "the mere existence of a potential claim or the distant possibility of litigation" is not enough, the standard is "not so inflexible as to require that litigation be imminent, or probable without significant contingencies." Id. (quotation omitted). "[F]oreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct." Victor Valley

Union High Sch. Dist. v. Superior Ct. of San Bernardino Cnty., 309 Cal. Rptr. 3d 258, 278 (Cal. App. Ct. 2023) (quotations omitted).

The Diocese dismissed Father Willis from the priesthood on August 16, 1985. The Diocese then destroyed Willis's personnel file ten years later, in 1995, pursuant to Canon Law. The court cannot say that future litigation regarding Willis was "reasonably foreseeable" in 1995. At that time, the statute of limitations for childhood sex abuse claims was six years. *See* 12 V.S.A. § 522 (1995). It was entirely reasonable for the Diocese to anticipate in 1995 that the generalized risk of claims involving Willis had been extinguished by the statute of limitations.[6] Moreover, there is no evidence that the Diocese acted with a "culpable state of mind" in destroying the files. The "mere failure to protect from the regular practice of document destruction does not give rise to the inference of spoliation." Barnes v. Fletcher Allen Health Center, No. 1242-04CN, 2007 WL 5444140 (Vt. Super. Ct. Nov. 14, 2007) (Katz, J.).

Furthermore, a jury could find that the destroyed documents from the file would have supported Plaintiff's claims only through speculation and conjecture. In fact, the evidence suggests that the destroyed material would not have supported Plaintiff's claims. The "Definitive Sentence," which summarizes the reasons for Willis's laicization, includes no mention of any pre-1977 notice to the Diocese of an allegation or propensity concerning sexual misconduct with children. "[T]he presumption arising from the fact of spoliation of evidence does not relieve the other party from introducing evidence tending affirmatively to prove his case so far as he has the burden. It cannot supersede the necessity of other evidence." F. R. Patch Mfg. Co. v. Prot. Lodge, No. 215, Int'l Ass'n of

---

[6] Plaintiff asserts that the statute of limitations for other claims of which the Diocese was aware had not yet passed. The relevant question, however, relates to Plaintiff's claims.

Machinists, 77 Vt. 294, 329 (1905). Rather, "[t]he presumption is regarded as merely [a] matter of inference in weighing the effect of evidence in its nature applicable to the question in dispute." Id. Plaintiff is not entitled to an adverse inference or any other potential spoliation remedy.

With no notice to the Diocese that Willis specifically posed a risk before 1977, the matter turns on whether knowledge of other priests' misconduct is sufficient. Plaintiff asserts that, by 1977, the Diocese was well aware of a "generalized risk of harm posed by Diocese priests to Diocese children." Pl.'s Opp'n at 23. To support the proposition that a generalized risk of harm is enough, Plaintiff relies primarily on two recent abuse cases in the school context. In Blondin v. Milton Town School District, No. 420-4-17 Cncv, slip copy at 11–12 (Vt. Super. Ct. July 15, 2019), this court observed that "'a generalized risk can contribute to establishing foreseeability, but only when it is accompanied by some knowledge of specific, similar acts or incidents of harm.'" (quoting Stopford v. Milton Town Sch. Dist., 2018 VT 120, ¶ 19, 209 Vt. 171). There, this court concluded on summary judgment that foreseeability was a fact question for the jury where the assault on plaintiff mirrored a previous assault by older members of the same high school football team at a team dinner, and where school officials were well aware of a history of harassing and hazing behavior and the fact that another student had quit the team and was threatening suicide due to bullying. Id. at 12. Affirming on appeal, the Supreme Court concluded that the school district did not preserve its lack-of-foreseeability argument, but also reiterated its discussion on generalized risks of harm from Stopford:

> [A]lthough Stopford stands for the proposition that a school
> must have some specific notice of a particular risk to be liable
> for a student-on-student assault, we did not suggest that a
> school could not be liable if it knew that students in a given
> situation in a particular setting posed a risk of harm to other

9

> students but did not know which particular students in that situation posed a risk of harm.

Blondin v. Milton Town Sch. Dist., 2021 VT 2, ¶ 23 n.8, 214 Vt. 44.

Stopford had involved an earlier case of assault by older teammates on the same high school football team as in Blondin, allegedly resulting in plaintiff's suicide. Stopford, 2018 VT 120, ¶ 1. The Court affirmed the trial court's grant of summary judgment for the school district, concluding that the district did not breach a duty of care because it "did not have any knowledge or notice to make the assault foreseeable." Id. ¶ 16. Knowledge that football team members previously made "homophobic comments to each other, with no accompanying physical contact," did not make it foreseeable to the school district that two of its students would forcibly assault another. Id. ¶ 18. The Court also rejected the plaintiff's argument that "a nationwide epidemic of school hazing and harassment contributed in making the assault . . . foreseeable." Id. ¶ 19. It recognized that a generalized risk can contribute to establishing foreseeability, "but only when . . . accompanied by some knowledge of specific, similar acts or incidents of harm." Id. The Court explicitly noted its agreement "with other jurisdictions that a generalized knowledge of harassment and hazing on other school campuses, without more, is not sufficient evidence of foreseeability." Id. (citing Mirand v. City of New York, 637 N.E.2d 263, 266 (N.Y. 1994) ("Actual or constructive notice to the school of prior similar conduct is generally required because, obviously, school personnel cannot reasonably be expected to guard against all of the sudden, spontaneous acts that take place among students . . . .")); Whitfield v. Bd. of Educ., 789 N.Y.S.2d 188, 189 (N.Y. App. Div. 2005); Williams v. United Pentecostal Church Int'l, 115 S.W.3d 612, 615-16 (Tex. Ct. App. 2003)); see also Edson v. Barre Supervisory Union No. 61, 2007 VT 62, ¶ 14, 182 Vt. 157 (school

district "did not have the requisite knowledge or notice of [student's] premeditated murder to bring it within the realm of the foreseeable").

Here, Plaintiff cites evidence that the Diocese had notice that multiple other priests in its employ had abused children before 1977. The Diocese argues that the vast majority of this evidence is inadmissible. *See* Gates v. Mack Molding Co., Inc., 2022 VT 24, ¶ 14, 216 Vt. 379 ("To survive a defendant's motion for summary judgment, the plaintiff must respond with specific facts to raise a triable issue and demonstrate sufficient *admissible evidence* to support a prima facie case.") (emphasis added). For example, Plaintiff asserts that in August 1953, Father Eastman took a 17-year old girl from her family to Atlantic City, gave her an engagement ring, and sexually assaulted her. Pl.'s Statement of Undisputed Mat. Facts ¶ 8 (citing Ex. 7). But the exhibit cited contains inadmissible hearsay within hearsay: it is a memo written by an unidentified author, and recounts a phone call from the mother of the 17-year old girl in which the mother recounted other phone calls with unidentified relatives and her daughter. Ex. 7. Similarly, Plaintiff asserts that in 1963, Father Foster reported to Msgr. Brennan that Father Campbell had been spending time with the Toman family, and that one of the daughters reported that Campbell did "strange things," including undressing himself in front of the children and "hav[ing] them touch him." Pl.'s Stmt. of Facts ¶ 33 (citing Ex. 31). The cited exhibit is another memo that does not identify the author, and appears to contains information that Fr. Foster learned from interviewing the children's father, who in turned had recounted statements made to him by his children. Ex. 31. Thus, it is inadmissible hearsay if offered to prove that abuse occurred.

There are several other examples:

- Plaintiff asserts that in 1969, Fr. Gallagher sexually abused two boys on an overnight visit. Pl.'s Stmt. of Facts ¶ 62 (citing Ex. 58). The cited exhibit is an anonymous letter addressed to a "Mr. Zuk," and is inadmissible hearsay within hearsay in that it recounts statements made by the two boys. Ex. 58. It is not a business record because there is no evidence that it was authored by a Diocese employee. Id. Moreover, the exhibit does not even mention Fr. Gallagher. Id.

- Plaintiff asserts that during the 1960s, E.D. reported to the Diocese that he was molested by Fr. Murtagh. Pl.'s Stmt. of Facts ¶ 63 (citing Exhibit 59). The cited exhibit, however, is a 1987 memorandum written by Bishop Marshall that contains extensive inadmissible hearsay from multiple declarants. Ex. 59. The memo is not a business record because it was not "made at or near the time" of the event in question. V.R.E. 803(6).

- Plaintiff also asserts that, in 1970, R.M. reported to Fr. Pinard that Fr. Baffa had sexually abused him. Pl.'s Stmt. of Facts ¶ 71 (citing Ex. 66). The cited exhibit is a 2003 email from R.M. to Father Searles recounting the 1970 report. Ex. 66. The email contains hearsay within hearsay, and is not a business record because it was not authored by a Diocese employee, nor was it "made at or near the time" of the event in question. V.R.E. 803(6).

- Plaintiff further asserts that in 1974, a police officer in Maine called Msgr. Buckley and informed him that Fr. Thompson was picked up for drinking heavily and forcing his way into a car to accost a young man. Pl.'s Stmt. of Facts ¶ 104 (citing Ex. 90). The cited exhibit is a 1981 memo by Msgr. Buckley recounting the 1974 phone call, which contains hearsay within hearsay and is not a business record. Ex. 90.

All of this evidence, however, could be admissible as evidence not that each incident occurred, but that the Diocese was on notice that multiple priests had been accused of child sexual abuse. *See* V.R.E. 801(c); *see also* State v. Beattie, 157 Vt. 162, 166 (1991) ("The statement was not hearsay, because it was not offered for the truth of the matter asserted."); 2 McCormick On Evid. § 249 (8th ed.) ("A statement that D made a statement to X is not . . . hearsay when its purpose is to establish the state of mind thereby induced in X, such as receiving notice or having knowledge or motive . . . .") (footnotes

12

omitted). That is not to say that all the evidence would actually be admitted at trial, of course. But for purposes of summary judgment, the court concludes that much of the material evidence appears to be admissible to show notice. In any event, the Diocese itself acknowledged a few years after Willis's alleged abuse of Plaintiff, when terminating Willis, that it was "painfully aware of the number of civil suits pending against dioceses in the United States of America because of priests who are accused of the same crimes" as Willis. Definitive Sentence, Ex. 89, p. 46 (Aug. 16, 1985).

Assuming that the evidence would be admissible to prove notice, Plaintiff has established that by 1977, the Diocese had notice of as many as ten priests who exhibited sexual misconduct toward children in the State of Vermont over a 25-year period.[7] The Diocese appears to admit as much: "In the light most favorable to Plaintiff (and without waiving any evidentiary issues), by 1977, the Diocese arguably received some kind of notice that ten priests had engaged in sexual misconduct towards minors over at least a thirty-year period across the whole state of Vermont." Def.'s Sur-Sur-Reply at 8 (footnote omitted). Both parties suggest that the quantity of instances of notice relative to the size of the institution is important. The Diocese notes that in 1976 there were 166 active priests in the Burlington Diocese plus 3 extern priests in Vermont, Def.'s Reply at 22 n.7, while Plaintiff argues that under that logic, the alleged abuse here was foreseeable because the

---

[7] This number is something of a moving target. *See* Def.'s Sur-Sur-Reply at 8; Pl.'s Sur-Reply at 8 nn.2 & 3 (listing 27 priests, including Willis—but some were not accused until later); Def.'s Reply at 10–14; Pl.'s Opp'n at 4 (citing Pl.'s Statement of Facts ¶¶ 3–116) (asserting that the Diocese had knowledge of at least 15 priests who had "either sexually abused children" or engaged in other "sexual misconduct"). So far as the court can discern, Plaintiff's Statement of Undisputed Material Facts establishes 10 such priests prior to 1977: Frs. Eastman, Mooney, Dussault, Campbell, Gallagher, Murtagh, Baffa, Bean, Paquette, and Thompson. *See* Exs. 7, 13, 17, 31, 58, 59, 66, 69, 74, 82, 90. Plaintiff lists other priests who were accused of consensual relationships with adults, but those do not evince a propensity to abuse children.

Diocese "had double the level of notice as compared to Milton High School" in Blondin. Pl.'s Sur-Reply at 8–9.

There is, of course, no mathematical formula to determine foreseeability. Clearly, one isolated complaint of abuse by one priest over 30 years would not be enough. Correspondingly, even the Diocese would likely concede that 160 reports out of 166 priests would have made it foreseeable that every priest was a risk. At some point along this spectrum of knowledge, the Diocese's obligation to supervise priests evolved. By now, the expectations for protection of minors in a church environment surely have changed. *See generally* 4 Litigating Tort Cases § 54:42 (noting that "[t]he problem of clergy sexual abuse is chronic and insidious" and that thousands of Catholic priests have molested children). The question is when over the years the church's duties of supervision changed. Had it changed by 1977, when the Diocese had notice of complaints of abuse by at least 10 of its priests other than Willis? Perhaps.[8] This is not a line the court can draw as a matter of law. The duty is one of appropriate supervision of employees to avoid harm to others. "Vermont common law imposes a general duty of ordinary care: to act as a reasonably prudent person would in similar circumstances." Deveneau v. Wielt, 2016 VT 21, ¶ 8, 201 Vt. 396. Whether in the exercise of such ordinary care a reasonable Diocese would have

---

[8] As early as 1962, another court noted the general foreseeability of sexual molestation of unsupervised children:

> It is certain that there exists in our civilization the constant possibility that persons suffering from a lack of proper mental balance or normal decency might subject young people to sexual molestation. This fact is illustrated by frequent newspaper accounts of crimes against children, the many litigated criminal cases, accounts of which find their way into the reports, and the concern of the Legislature evidenced by the enactment of many laws for the protection of children.

Wallace v. Der-Ohanian, 18 Cal. Rptr. 892, 896 (Cal. Ct. App. 1962).

taken further steps in 1976 and 1977 to protect minor congregants, given what it knew at the time, is a question for the jury.[9]

Blondin supports this conclusion. There, the evidence of foreseeability involved abuse by members of the same high school football team during the previous school year. Blondin, No. 420-4-17 Cncv, slip copy at 11–12. Here, the proffered evidence of foreseeability involves abuse by at least 10 other priests at other parishes within the same Diocese during the 25-year period before the alleged abuse of Plaintiff by Willis in 1976–77. Bondin involved a shorter timeframe and a smaller universe of actors, but its fact pattern is similar. Moreover, the Supreme Court clarified in Blondin that notice that a *particular person* posed a risk is not required. Blondin, 2021 VT 2, ¶ 23 n.8 (In "Stopford . . . , we did not suggest that a school could not be liable if it knew that students in a given

---

[9] In a recent case, our Supreme Court noted that it "recently had occasion to express our doubt about whether foreseeability is a jury issue." Fleurrey v. Dep't of Aging & Indep. Living, 2023 VT 11, ¶ 16 (citing Stopford, 2018 VT 120, ¶ 20). However, it has also held that "the existence of a legal duty . . . relied in part on a factual determination to be made by the jury." Higgins v. Bailey, 2021 VT 74, ¶ 10, 215 Vt. 461 (citing LeClair v. LeClair, 2017 VT 34, 204 Vt. 422). In LeClair, the Court had held that "[a] jury could conclude that, in ordering plaintiff to climb onto the roof despite its dangerous condition acknowledged by both defendant and plaintiff, defendant should have anticipated that the condition of the roof presented an unreasonable risk of harm to plaintiff." 2017 VT 34, ¶ 13. The cases appear to be reconcilable if looked at as merely stating the usual summary judgment rule: where the issue of foreseeability is obvious, a court can rule on the issue as a matter of law, but where there is room for debate, and a reasonable jury could potentially find foreseeability, the court must defer to the jury. "Ordinarily, foreseeability is a question of fact for the jury unless the circumstances of the injury are so highly extraordinary or improbable as to be wholly beyond the range of expectability." Est. of Jones v. State, 15 P.3d 180, 187 (Wash. Ct. App. 2000) (quotation omitted).

Dobbs adamantly maintains that foreseeability is properly left to the jury as part of the "breach of duty" element, rather than the threshold element of duty: "Yet some courts have imported considerations of foreseeability into the process of deciding whether a defendant has a duty to exercise care. The effect of that is to allow judges, who decide all duty issues, to decide foreseeability for themselves, bypassing the jury and short-circuiting full analysis of the case. The Restatement explicitly disapproves the use of foreseeability as a factor in determining the existence of a duty of care." Dobbs, The Law of Torts § 256 (2d ed.) (footnotes omitted); *see also* W. Jonathan Cardi, Purging Foreseeability: the New Vision of Duty and Judicial Power in the Proposed Restatement (Third) of Torts, 58 Vand. L. Rev. 739, 740 (2005) ("For those responsible for understanding tort doctrine, the concept of foreseeability is a scourge, and its role in negligence cases is a vexing, crisscrossed morass. Indeed, one torts professor teaches that foreseeability might as well be called 'strawberry shortcake,' having been bent, muddled, and co-opted to such a degree that it has lost any real meaning.").

15

situation in a particular setting posed a risk of harm to other students but did not know which particular students in that situation posed a risk of harm.").

This conclusion is also consistent with Stopford. While "a generalized knowledge" of child abuse by other priests in other Dioceses, "without more, is not sufficient evidence of foreseeability," such a generalized risk "can contribute to establishing foreseeability . . . when it is accompanied by some knowledge of specific, similar acts or incidents of harm." Stopford, 2018 VT 120, ¶ 19. Here, the generalized risk of abuse by priests was accompanied by knowledge of "specific, similar acts" of child sexual abuse by priests within the very same Diocese. The facts here are distinct from those in Stopford, where neither the knowledge that football team members previously made "homophobic comments to each other, with no accompanying physical contact" nor "a nationwide epidemic of school hazing and harassment" made it foreseeable to the school district that two of its students would forcibly assault another. Id. ¶¶ 18–19. Again, the proffered notice here is not merely an epidemic of a different character—such as hazing or harassment— by priests, or reports of priest sexual abuse in other parts of the country. The notice is complaints of specific, similar acts of sexual abuse by multiple priests within the same Diocese.

The Diocese relies on Williams v. United Pentecostal Church Int'l, 115 S.W.3d 612, 615-16 (Tex. Ct. App. 2003), cited favorably in Stopford. There, the Texas appellate court rejected the plaintiff's argument that generalized knowledge of prevalence of abuse of children in a church setting satisfies the foreseeability requirement. Id. at 615–17. The defendant—the Texas District of the United Pentecostal Church—had "no information from which it should have known of an unreasonable risk" that the specific pastor would sexually abuse plaintiffs, and the general knowledge that such abuses of children occur in

church programs and facilities was not enough to establish foreseeability. <u>Id</u>. at 617. <u>Williams</u> does not compel a different conclusion here, however. The evidence of notice in <u>Williams</u> amounted to an expert opinion that the defendants "should have known of the risks of sexual abuse and exploitation of minors in church programs and facilities," one defendant's acknowledgement that "there's always a risk," and another defendant's concession that it was "long aware of a risk." <u>Id</u>. at 615–16. Such general knowledge comes nowhere close to the knowledge of multiple, specific, and similar reported incidents within the same Diocese in the present case.

Several courts have suggested that religious entities can be liable for negligent hiring and/or supervision only where specific issues as to a particular clergy member put the authority on notice of a potential for problems. *See, e.g.*, <u>Doe v. Liberatore</u>, 478 F. Supp. 2d 742, 762 (M.D. Pa. 2007); <u>Doe v. Hartz</u>, 970 F. Supp. 1375, 1428 (N.D. Iowa 1997), <u>rev'd on other grounds,</u> 134 F.3d 1339 (8th Cir. 1998); <u>Moses v. Diocese of Colorado</u>, 863 P.2d 310, 329 (Colo. 1993); <u>Schovanec v. Archdiocese of Oklahoma City</u>, 188 P.3d 158, 171–72, (Okla. 2008); <u>Kenneth R. v. Roman Cath. Diocese of Brooklyn</u>, 654 N.Y.S.2d 791, 793 (N.Y. App. Div. 1997); <u>L.L.N. v. Clauder</u>, 209 Wis. 2d 674, 699, 563 N.W.2d 434, 445 (1997); *see also* <u>Kennedy v. Roman Cath. Diocese of Burlington, Vermont, Inc.</u>, 921 F. Supp. 231, 234 (D. Vt. 1996) (granting summary judgment to Diocese on negligence claims where "[t]he plaintiff has failed to produce evidence which suggests that, at any time, the Diocese knew or should have known of Father Wysolmerski's propensity to engage in wrongful sexual activity.").

However, those cases are not consistent with <u>Stopford</u> and <u>Blondin</u>, which explicitly establish that, under Vermont law, the "specific, similar acts or incidents of harm" required to establish foreseeability need not have involved the same individual. *See*

17

Blondin, 2021 VT 2, ¶ 23 n.8. At least one other jurisdiction has adopted the same approach, finding that notice of numerous sexual assaults by other priests, teachers, coaches, or scout leaders can make it foreseeable that such risks exist as to all children from all such actors. *See* Doe v. Roman Cath. Archbishop of Los Angeles, 285 Cal. Rptr. 3d 613, 627–28 (Cal. Ct. App. 2021) ("Based on this evidence, it was reasonably foreseeable that minors attending catechism classes in 1988 might be sexually molested by a priest, even though the Archdiocese did not have knowledge of prior sexual misconduct by Higson specifically."); Brown v. USA Taekwondo, 253 Cal. Rptr. 3d 708, 728 (Cal. Ct. App. 2019) (based on allegation that "sexual abuse of minors by figures of authorit[y], like priests, coaches, and scout leaders was a widely known risk in American society, . . . it was foreseeable youth athletes attending Olympic qualifying competitions with their coaches might be sexually molested by their coaches, regardless of whether [USA Taekwondo] had knowledge of prior sexual misconduct by [the specific coach]"); Doe v. United States Youth Soccer Assn., Inc., 214 Cal. Rptr. 3d 552, 567 (Cal. Ct. App. 2017) (despite no knowledge of prior abuse by specific coach, "it was reasonably foreseeable to defendants that a child participating in their soccer program would be sexually abused by a coach" based on knowledge of sexual abuse by other soccer coaches); Juarez v. Boy Scouts of Am., Inc., 97 Cal. Rptr. 2d 12, 31 (Cal. Ct. App. 2000) ("it should be reasonably foreseeable to the Scouts that a child participating in scouting might fall prey to a sexual predator, with no documented history of such proclivities, who is serving as an adult volunteer in the child's scouting troop.").

While foreseeability is an important factor in establishing the existence of a duty, it is not the only factor. Hamill v. Pawtucket Mut. Ins. Co., 2005 VT 133, ¶ 6, 179 Vt. 250. "Ultimately, whether a duty exists is a question of fairness that depends on, among other

factors, the relationship of the parties, the nature of the risk, and the public interest at stake." Id.; *see also* Langle v. Kurkul, 146 Vt. 513, 519 (1986) (listing numerous factors including "considerations of public policy."). These factors all strongly support the imposition of a duty here. It is undeniable that the public has a significant interest in protecting children from the risk of sexual abuse. Imposing a duty here is fair, given that the Diocese has authority over its employee-priests and is in a position to regulate their conduct. Given the evidence of foreseeability described above, a jury could reasonably find the Diocese liable for negligent supervision. Accordingly, the Diocese is not entitled to summary judgment on this claim.

## II.     Breach of Fiduciary Duty (Count 3)

Plaintiff alleges that the Diocese had a fiduciary relationship with him, and that it breached its fiduciary duties toward him by failing to warn him of the danger posed by Father Willis and to protect him from Willis's abuse. Am. Compl. ¶¶ 327–50. He asserts that the Diocese created and fostered a fiduciary relationship through its doctrinal teachings, Plaintiff's beliefs, and Plaintiff's service as an altar boy for Willis. *See* Pl.'s Opp'n at 14–20; Pl.'s Statement of Undisputed Mat. Facts ¶¶ 234–42.

To support his fiduciary duty claim, Plaintiff cites to the Restatement (Second) of Torts § 315 (employer's duty to control employee so as to prevent harm to a third person) and Restatement (Third) of Agency § 7.05, cmt. (e) (duty to take reasonable steps to protect children who are particularly vulnerable to sexual abuse). Plaintiff's reliance on those Restatement sections is misplaced, however. Breach of fiduciary duty claims "are distinct from ordinary negligence claims and rest on different elements of proof." Sutton v. Vermont Reg'l Ctr., 2019 VT 71A, ¶ 75, 212 Vt. 612. "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty

imposed by the relation." Id. (quoting Restatement (Second) of Torts § 874). A fiduciary relationship arises "when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Handverger v. City of Winooski, 2011 VT 134, ¶ 11, 191 Vt. 84 (quotations omitted). To become a fiduciary, the "relationship had to ripen into one in which [one party was] dependent on, and reposed trust and confidence in, the [other party] in the conduct of its affairs." McGee v. Vermont Fed. Bank, FSB, 169 Vt. 529, 530 (1999) (mem.). "The fiduciary's overall duty is one of loyalty to the beneficiary," which "ordinarily requires the fiduciary to put his beneficiary's interests ahead of his own." Dobbs' Law of Torts § 267 (2d ed.). Moreover, "the fiduciary may be obliged to act in a positive way to protect the beneficiary, meaning that the general rule of nonliability for 'doing nothing' offers little protection for the fiduciary." Id.

There "is a split in authority concerning whether and under what circumstances relationships between members of the clergy or a diocese and an individual parishioner can give rise to an actionable fiduciary duty." Doe v. Hartz, 52 F. Supp. 2d 1027, 1060 (N.D. Iowa 1999). Some courts "have recognized the fiduciary nature of the clergy-parishioner relationship," particularly where clergy provide counseling to the parishioners. Moses v. Diocese of Colorado, 863 P.2d 310, 322 (Colo. 1993); *see also*, *e.g.*, Destefano v. Grabrian, 763 P.2d 275, 284 (Colo. 1988) (holding a priest who abuses his role as counselor can be liable for breach of fiduciary duty); Erickson v. Christenson, 781 P.2d 383, 386 (Or. Ct. App. 1989) (same); Adams v. Moore, 385 S.E.2d 799, 801 (N.C. Ct. App. 1989) (finding that preacher who counselled parishioner owed fiduciary duty to parishioner and violated that duty by using his position and influence to obtain the deed to parishioner's home).

20

The relationship between a diocese and parishioner, however, is less direct than that between a priest and parishioner. "It is unclear whether a cause of action for breach of fiduciary duty between a church and its congregants exists in Vermont." Doe v. Newbury Bible Church, No. 1:03–cv–211, 2005 WL 1862118, at *5 (D. Vt. July 20, 2005), *report & recommendation adopted,* No. 1:03–cv–211, 2005 WL 1962260 (D.Vt. Aug. 15, 2005), *aff'd* 509 F.3d 69 (2d Cir. 2007). Other courts have held that the mere status or general hierarchy of a diocese, without more, does not establish a fiduciary relationship. *See, e.g.*, Schovanec v. Archdiocese of Oklahoma City, 188 P.3d 158, 174 (Okla. 2008) (former parishioner, who alleged that he was sexually abused by priest, did not establish fiduciary relationship claim against archdiocese, absent proof of existence of confidential or fiduciary relationship between the archdiocese and parishioner); Doe v. Hartz, 52 F. Supp. 2d 1027, 1064 (N.D. Iowa 1999) (breach of fiduciary claim against Bishop and Diocese failed where plaintiff alleged "no contact, and hence no basis for a fiduciary duty, prior to [priest's] misconduct," and the mere "status of the Diocese and [Bishop], or any member of the clergy, is an insufficient basis for asserting such a duty"); Gray v. Ward, 950 S.W.2d 232, 234 (Mo. 1997) (no fiduciary relationship between plaintiff and diocese where plaintiff's allegations were based merely on general hierarchy of diocese).

As a Vermont federal court has noted, two federal cases interpreting Connecticut law have found such a fiduciary relationship under unique factual circumstances. Lewis v. Bellows Falls Congregation of Jehovah's Witnesses, 95 F. Supp. 3d 762, 765–66 (D. Vt. 2015); *see also* Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409, 430 (2d Cir.1999) (a reasonable jury could find a fiduciary duty when plaintiff attended a diocesan school and was taught by priests employed by the diocese; plaintiff participated in a small group of boys to whom the alleged abuser was a mentor; the alleged abuser

21

spent more time with plaintiff than other similarly situated boys; "[t]hese contacts were well known" in the school and diocesan communities; the diocese encouraged the alleged abuser to spend time with youths; and the diocese allowed the alleged abuser to take groups on church field trips); Doe v. Norwich Roman Catholic Diocesan Corp., 309 F.Supp.2d 247, 252 (D.Conn. 2004) (inferring a "unique situation" giving rise to a fiduciary duty when plaintiff alleged he participated in church-sponsored activities and the church chorus with defendant's encouragement; he consulted his alleged abuser for spiritual and religious counseling with the defendant's encouragement; and he had family dinners with his alleged abuser). Notably, in Martinelli, the church's knowledge of the priest's history of abuse and its failure to disclose this knowledge was an important factor in concluding that a fiduciary relationship existed. *See* Martinelli, 196 F.3d at 430.

The federal court in Lewis dismissed the plaintiff's fiduciary duty claim without prejudice for failure to adequately plead any "special or unique" relationship with the church congregation. Lewis, 95 F. Supp. 3d at 766. To successfully amend the complaint, the court stated that the plaintiff would have to "plead facts supporting (1) the 'particulars of [her] ties' to [the minister] and the Congregation, and (2) the Congregation's 'knowledge and sponsorship of that relationship.'" Id. (quoting Martinelli, 196 F.3d at 429).

Here, the Diocese's doctrinal teachings do not alone establish a fiduciary relationship. Nor do the beliefs on which Plaintiff was raised by his parents have any relevance to that inquiry. The most evidence of a fiduciary relationship here is Plaintiff's service as an altar boy, but Plaintiff identifies no evidence of the *Diocese's* involvement with Plaintiff's service as an altar boy for Willis. There is nothing to indicate that the Diocese itself encouraged Plaintiff to become an altar boy or otherwise spend time with

22

Willis. *See* Martinelli, 196 F.3d at 430; Norwich Roman Catholic Diocesan Corp., 309 F.Supp.2d at 252. Without more, the general status of the Diocese here does not establish a fiduciary relationship between it and Plaintiff. *Accord* Bernie v. Cath. Diocese of Sioux Falls, 821 N.W.2d 232, 242 (S.D. 2012) (no fiduciary relationship between diocese and students at catholic boarding school where students "identified no facts indicating that the Diocese . . . was acting as the custodian or parent of the students while they attended school" or that the students "reposed faith, confidence or trust in the Diocese—as opposed to the priests, monks, nuns, entity defendants, and the school who were caring for the students"); Petrell v. Shaw, 902 N.E.2d 401, 407 (Mass. 2009) (no fiduciary duty where any relationship between plaintiff and diocese was "based on no more than their shared religious affiliation and her role as a parishioner in a parish within the diocese" and where diocese never assumed any counselling role with plaintiff); Fortin v. The Roman Cath. Bishop of Portland, 871 A.2d 1208, 1219–22 (Me. 2005) (sufficient facts to establish fiduciary relationship with diocese where victim alleged that, during the seven-year period that he was abused by priest, he was both a parochial school student and altar boy, and that diocese knew that victim's parents suffered from illness that limited their involvement in raising victim). The Diocese is entitled to summary judgment on this claim.

### III.    Intentional Infliction of Emotional Distress (Count 7)

Plaintiff alleges that the Diocese's actions and inactions constituted outrageous conduct that caused him emotional harm. Am. Compl. ¶¶ 388–90. The Diocese had, Plaintiff contends, "at least twenty years of knowledge that any of its priest-employees was likely to pose an unreasonable risk of harm to Diocese children." Pl.'s Opp'n at 32. Plaintiff argues that the Diocese's "criminal behavior of enabling, aiding, abetting[,] and

23

concealing child sexual abuse" was outrageous and enabled Willis's assault of Plaintiff. Id. at 33. The Diocese seeks summary judgment on the grounds that none of the alleged outrageous conduct was directed at Plaintiff. Def.'s Mot. for Summ. J. at 22–23.

A claim for intentional infliction of emotional distress (IIED) must demonstrate "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." Davis v. Am. Legion, Dep't of Vermont, 2014 VT 134, ¶ 19, 198 Vt. 204 (citing Fromson v. State, 2004 VT 29, ¶ 14, 176 Vt. 395). Plaintiffs alleging IIED "carry a heavy burden." Id. ¶ 20. A defendant's actions must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." Id. (citing Cate v. City of Burlington, 2013 VT 64, ¶ 28, 194 Vt. 265). Such outrageous conduct must cause the plaintiff to suffer "distress so severe that no reasonable person could be expected to endure it." Id. (citing Baldwin v. Upper Valley Servs., Inc., 162 Vt. 51, 57 (1994)); *see also* Restatement (Second) of Torts § 46 cmt. d (1965).

The Diocese contends that the outrageous conduct must be "directed at" the plaintiff, citing Eskridge v. Diocese of Brooklyn, No. 517924/2019, 2022 WL 94106, at *1 (N.Y. Sup. Ct. Jan. 04, 2022) ("plaintiff has not alleged any actions on the part of defendant directed at him that rise to the level of 'extreme and outrageous conduct'") and Tucker v. Roman Cath. Diocese of Lafayette-In-Indiana, 837 N.E.2d 596, 603 (Ind. Ct. App. 2005). Plaintiff contends that for IIED claims in Vermont, there is no requirement that the outrageous conduct be "directed at" the plaintiff. Plaintiff cites Baptie v. Bruno,

2013 VT 117, ¶ 24, 195 Vt. 308, which merely restates the general elements for IIED and does not directly address the "directed at" question.

The "directed at" requirement is an obvious implication from the language of the Restatement itself:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> (2) *Where such conduct is directed at a third person*, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
> (b) to any other person who is present at the time, if such distress results in bodily harm.

Restatement (Second) of Torts § 46 (emphasis added). Subsection 2, by providing specific rules for liability where the conduct "is directed at a third person," makes it obvious that the default rule is that the outrageous conduct be directed at the plaintiff. Moreover, numerous courts have recognized that Restatement § 46(1) includes such a requirement. *See, e.g.*, Arnold v. Wilder, 657 F.3d 353, 368 (6th Cir. 2011) (affirming lower court that "correctly found that [defendant's] conduct was not directed at [plaintiff], as required by § 46(1)"); Potter v. Firestone Tire & Rubber Co., 863 P.2d 795, 800 (Cal. 1993) (no liability for IIED "in the absence of a determination that [defendant's] extreme and outrageous conduct was directed at plaintiffs"); Greene v. Roy, 604 So. 2d 1359, 1364 (La. Ct. App. 1992) (IIED claim failed for lack of evidence that defendant's conduct was "directed toward" plaintiff); Stram v. Farrell, 646 N.Y.S.2d 193, 196 (N.Y. App. Div. 1996) ("jury could rationally conclude that [defendant's] conduct was extreme and outrageous and that he had engaged in a deliberate and malicious campaign of harassment and

intimidation directed at plaintiffs"); <u>Anderson v. Oklahoma Temp. Servs., Inc.</u>, 925 P.2d 574, 577 (Okla. Ct. App. 1996) (noting that some of alleged conduct was "not specifically directed at" plaintiff).

Clearly, there is no evidence in this case that the Diocese's alleged outrageous conduct—including concealing child sexual abuse committed by priests other than Willis—was directed at Plaintiff. Plaintiff offers no argument that his IIED claim fits within Restatement § 46(2), nor any discussion of the nuances distinguishing Subsection 1 from Subsection 2. The Diocese is entitled to summary judgment on this claim.

IV. Failure to Prevent Harm (Count 6)

Plaintiff alleges that he had a special relationship with the Diocese such that it owed him a duty to prevent Willis from intentionally harming Diocese children. Am. Compl. ¶ 383. He claims the Diocese breached that duty by allowing Willis to be in contact with Diocese children, and by failing to prevent Willis from abusing him. <u>Id</u>. ¶¶ 384–87. The Diocese contends that this claim fails because there was no special relationship between the Diocese and Plaintiff giving rise to a duty of protection, and that even if such a duty existed, the Diocese did not engage in any grossly negligent conduct that breached the duty.

Under the Restatement (Second) of Torts ¶ 315:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315. In other words, either a special relationship between the Diocese and Willis or between the Diocese and Plaintiff could support this claim. The

former is essentially the negligent supervision claim addressed above. *See, e.g.*, <u>Niece v. Elmview Group Home</u>, 929 P.2d 420, 426 (Wash. 1997) ("[T]he relationship between employer and employee gives rise to a limited duty, owed by an employer to foreseeable victims, to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others. This duty gives rise to causes of action for negligent hiring, retention and supervision."). To that extent, although duplicative, this claim also survives for the same reasons set forth above.

Plaintiff relies on both theories of liability for this claim, however. With respect to the claim based on a special relation between the Diocese and Plaintiff, "[t]he relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320." Restatement (Second) of Torts § 315 cmt. c. Section 320 does not apply because it requires a "custodial" relationship (which is not even alleged here). The special relationships contemplated in Section 314A include common carrier-passenger, innkeeper-guest, land possessor-invitee, and one who "takes [] custody of another under circumstances such as to deprive the other of his normal opportunities for protection." <u>Id</u>. § 314A. Plaintiff does not argue that any of these relationships apply.

Instead, Plaintiff contends that the Diocese is liable under the Restatement (Third) of Agency § 7.05 ("When a principal has a special relationship with another person, the principal owes that person a duty of reasonable care with regard to risks arising out of the relationship, including the risk that agents of the principal will harm the person with whom the principal has such a special relationship."). Specifically, Plaintiff relies on comment (e) of that Section:

27

> In particular, relationships that expose young children to the risk of sexual abuse are ones in which a high degree of vulnerability may reasonably require measures of protection not necessary for persons who are older and better able to safeguard themselves. Such measures may include prohibiting unsupervised contact between a child and an employee.

Restatement (Third) Of Agency § 7.05 cmt. (e). The Diocese argues that this section has never been adopted by the Vermont Supreme Court. The Court continues to cite both the Second and Third Restatements, but has noted that "a growing number of our cases and cases from other jurisdictions reference the more recent Restatement (Third) of Agency." Est. of Kuhling by Kuhling v. Glaze, 2018 VT 75, ¶ 17 n. 4, 208 Vt. 273. The fact that it has not yet expressly adopted this section does not suggest that this court should not look to it as the latest statement of the law. In any case, the "special relationship" doctrine is not a creation of this section. *See, e.g.*, Montague v. Hundred Acre Homestead, LLC, 2019 VT 16, ¶¶ 15–16, 209 Vt. 514.

However, the comment provides only that a special relationship that exposes young children to a risk of sexual abuse may require certain measures of protection. It does not discuss when a special relationship exists. "Whether such a relationship exists is a question of law." Restatement (Third) Of Agency § 7.05 cmt. (e).

Vermont cases have not addressed this question, but others have found such a relationship. One court has expressly found a special relationship "between a church and the children of its congregation [.]" C.J.C. v. Corp. of Cath. Bishop of Yakima, 985 P.2d 262, 273 (Wash. 1999), as amended (Sept. 8, 1999) (en banc). The court noted that this was "an issue of first impression." Id. In concluding that such a relationship exists, it explained: "In many respects, the activities of a church, and the corresponding duties legitimately imposed upon it, are similar to those of a school. As a matter of public policy,

28

the protection of children is a high priority." Id. at 274. Another has found that although "[t]here was no special relationship between the church and all of the children in the Congregation simply because they were members of the church," when children were "harmed during a church-sponsored activity, . . . defendants' control over that activity placed them in special relationships" with the children. Conti v. Watchtower Bible & Tract Soc'y of New York, Inc., 186 Cal. Rptr. 3d 26, 41, 44 (Cal. Ct. App. 2015); *see also* Juarez, 97 Cal Rptr. 2d at 35–36 ("Generally, a greater degree of care is owed to children because of their lack of capacity to appreciate risks and avoid danger. . . [A] special relationship existed between the Scouts and Juarez giving rise to a duty to protect him from harm caused by the criminal conduct of third parties.") (disapproved of on other grounds by Brown v. USA Taekwondo, 483 P.3d 159, 170 n.9 (Cal. 2021)).

The Diocese is distinct from many other entities in that its teachings purposefully create an atmosphere of deference, trust, and respect for their priests. Children brought up in such an atmosphere are surely more vulnerable to abuse than in other settings. Representatives of the Diocese have conceded as much. Bishop Angell acknowledged at his deposition the following: "the Diocese occupies a very special role with respect to protecting innocent children as it relates to the assignment of priests" SMF ¶ 228, Ex. 182. Bishop Matano testified that he had a "responsibility to seek to screen out anyone as a priest who might physically or psychologically injure members of the Diocese . . . [a]nd children in particular" because "children are particularly vulnerable." SMF ¶ 229, Ex. 183. The allegations here include that Plaintiff served as an altar boy and was abused by Willis in the sacristy[10] of the church and in the confessional. SMF ¶¶ 242, 243, 246. The court

---

[10] A sacristy is "a room in a church where a priest prepares for a service[.]" Oxford Advanced American Dictionary, available at: oxfordlearnersdictionaries.com/us/definition/american_english/sacristy. (accessed Nov. 9, 2023).

concludes that a special relationship between the Diocese and the minor plaintiff existed here.[11]

## V.    Civil Conspiracy (Count I)

Plaintiff alleges that the Diocese, through various Bishops and other high-ranking Diocese employees, engaged in a wide-ranging conspiracy to conceal sexual abuse of children by its employees for the purpose of preventing scandal and maintaining the Diocese's reputation and financial status. Am. Compl. ¶¶ 308–10. Plaintiff alleges that the conspiracy continued from 1963 until 2007. Id. ¶ 311. The Diocese seeks summary judgment on the grounds that there is no evidence of an "agreement" among the co-conspirators regarding Willis or Plaintiff, and because there was no illegal act in furtherance of the alleged conspiracy that caused Plaintiff damages. Def.'s Mot. for Summ. J. at 23–26. Plaintiff argues that the Diocese repeatedly concealed sexual abuse and protected its abuser-priests from liability for decades, and that this enabled child sexual abuse by its priests for decades and ultimately allowed Willis to abuse Plaintiff in 1976–77 without fear of punishment. Pl.'s Opp'n at 7–13.

---

[11] This a result is not inconsistent with the conclusion that no fiduciary duty exists here. The fiduciary duty is distinguishable from the duty arising from the "special relationship" doctrine. A duty of loyalty, and not to put one's interests ahead of another's, is broader than a duty to prevent harm. Cf. Gregan v. Kelly, 355 S.W.3d 223, 228 (Tex. App. 2011) ("A fiduciary relationship is an extraordinary one and will not be lightly created. It is well settled that not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship.") (citation and quotations omitted); Franchi v. New Hampton Sch., 656 F. Supp. 2d 252, 264 n.8 (D.N.H. 2009) ("The most obvious example may be the doctor-patient relationship, where the patient no doubt places special trust or reliance in the doctor, but the duty to use reasonable care under the circumstances—rather than a fiduciary duty—governs.") (quotation omitted); Beckstrom v. Parnell, 730 So. 2d 942, 947–48 (La. Ct. App. 1998) ("The fiduciary's duty includes the ordinary duties owed under tort principles, as well as a legally imposed duty which requires the fiduciary to handle the matter as though it were his own affair. . . . It is this duty of loyalty which distinguishes the fiduciary relationship."); US Fuel, LLC v. Fullerton, 2021 WL 6426122, at *3 (Conn. Super. Ct. Dec. 21, 2021) ("Mere negligence alone is insufficient to breach a fiduciary duty. . . . [A] fiduciary relationship, and its attendant duty, arises from a more particularized relationship than those that are the subject of the law of negligence. . . . This is so because a cause of action for a breach of a fiduciary duty exists to address not the failure to exercise due care—the office of the tort of negligence—but to counterbalance the fiduciary's opportunities for self-dealing . . . .") (quotation omitted).

"To state a claim for civil conspiracy under Vermont law a plaintiff must allege the existence of 'a combination of two or more persons to effect an illegal purpose, either by legal or illegal means, or to effect a legal purpose by illegal means.'" Catamount Radiology, P.C. v. Bailey, No. 1:14-CV-213, 2015 WL 5089104, at *3 (D. Vt. Aug. 27, 2015) (quoting Boutwell v. Marr, 71 Vt. 1, 42 A. 607, 609 (1899)). Additionally, "something causing damage to the plaintiff [must have] been done in furtherance of the agreement." Boutwell, 71 Vt. 1, 42 A. 607, 609. Notably, a three-justice panel of our Supreme Court has expressed doubt whether an independent cause of action for the tort of civil conspiracy still exists. Davis v. Vile, No. 2002-465, 2003 WL 25746021, at *3 (Vt. Mar. 2003) (unpub. mem.) ("[a]ssuming that there continues to be an independent cause of action for the tort of civil conspiracy," and citing cases from other states holding that civil conspiracy is not actionable in and of itself); *see also* Catamount Radiology, 2015 WL 5089104, at *3 n.2 (expressly stating that neither party had addressed the issue and that it would assume the existence of civil conspiracy for purposes of the pending motion); Manheimer v. Our Court Tennis Club, 2023 WL 5341142, at *5 (Vt. Aug. 18, 2023) (unpub. mem.) ("Assuming without deciding that Vermont still recognizes an independent claim for civil conspiracy, plaintiff has not alleged the requisite elements.").

Plainly, the majority position of other jurisdictions is that conspiracy is not an independent tort. As a leading authority on tort law notes, "[c]onspiracy is not a tort in itself; it reflects the conclusion that each participant should be liable for the tortious course of conduct." Dobbs, The Law of Torts § 435 (discussing conspiracy under a treatise section titled "other bases for vicarious liability"); *see also* Wright v. Brooke Group Ltd., 652 N.W.2d 159, 172 (Iowa 2002) ("Thus, conspiracy is merely an avenue for imposing vicarious liability on a party for the wrongful conduct of another with whom the party has

31

acted in concert."); <u>Agar Corp. v. Electro Circuits Intern.</u>, *LLC*, 580 S.W.3d 136, 140–42 (Tex. 2019) (expressly joining the majority of states in holding that civil conspiracy is not an "independent claim," but instead is "a vicarious liability theory that imparts joint-and-several liability to a co-conspirator who may not be liable for the underlying tort"); <u>Jane Doe-1 v. Corporation of President of The Church of Jesus Christ of Latter-day Saints</u>, 801 S.E.2d 443, 458 (W. Va. 2017) ("a civil conspiracy claim requires an underlying tort or harm resulting from the conspiracy"); <u>Jones v. City of Chicago</u>, 856 F.2d 985, 992 (7th Cir. 1988) ("In a tort case . . . , the function of conspiracy doctrine is merely to yoke particular individuals to the specific torts charged in the complaint."); *but cf.* <u>Lewis v. Lead Industries Ass'n</u>, 2020 IL 124107, 178 N.E.3d 1046 (Ill. 2020) ("Illinois recognizes civil conspiracy as a distinct cause of action . . . . The function of a civil conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts. To state a claim for civil conspiracy, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement.") (internal citations omitted).

Given this backdrop, it is reasonable to predict that our Supreme Court would not resurrect "civil conspiracy" as an independent tort. Whether it is recognized as an independent tort or not, however, would make no difference here. There is no evidence of an agreement to facilitate Willis's alleged sexual assault of Plaintiff, nor of a causal connection between the alleged conspiracy and the harm to Plaintiff from Willis's abuse of him in 1976–77.

First, there is no evidence that the Diocese conspired to facilitate Willis's alleged sexual assault of Plaintiff. Rather, the evidence indicates that the Diocese's actions were taken to prevent scandal and maintain the Diocese's reputation and financial stability.

*See* Doe v. Norwich Roman Cath. Diocese, 909 A.2d 983, 987 (Conn. Super. Ct. 2006) (granting summary judgment to Diocese where there was no evidence or allegation that Diocese "combined to facilitate [priest's] sexual assault of the plaintiff or anyone else. The purported purpose of the conspiracy was to conceal from public awareness past instances of sexual abuse at the hands of priests to eliminate or minimize the scandalous impact of such information. That alleged objective is a far cry from a conspiracy to facilitate molestation of children by [the accused priest] or priests generally."). "Civil conspiracy requires specific intent" and, thus, "parties cannot engage in a civil conspiracy to be negligent." Firestone Steel Prod. Co. v. Barajas, 927 S.W.2d 608, 614 (Tex. 1996). That the Diocese's actions to prevent scandal and improve reputation and financial stability—however disturbing and deserving of criticism—might have negligently enabled priests to sexually assault children does not save a civil conspiracy claim.

Plaintiff maintains that the Diocese committed the illegal act of aiding and abetting multiple priests in sexual abusing children by: (1) failing to report abuse to authorities; (2) moving priests who had abused children to different parishes to conceal the abuse; (3) preventing victims of priest abuse from speaking publicly about their abuse; (4) attempting to prevent prosecution of priest-abusers; (5) and failing to notify other priests and parishioners that a priest had previously sexually abused children. Pl.'s Opp'n at 8–9. But Plaintiff identifies no evidence that the Diocese's alleged co-conspirators ever took those actions with respect to Willis or Plaintiff. As noted above, there is no evidence that the Diocese ever received a report of sexual misconduct concerning Willis before his alleged abuse of Plaintiff in 1976–77. While Plaintiff suggests that Willis was aware of the conspiracy and that the conspiracy allowed Willis to abuse Plaintiff in 1976–77, this is pure speculation that cannot support a jury verdict. *See* Bernasconi v. City of Barre, 2019

33

VT 6, ¶ 11, 209 Vt. 419 ("'Evidence which merely makes it possible for the fact in issue to be as alleged, or which raises a mere conjecture, surmise or suspicion, is an insufficient foundation for a verdict,' and thus where the jury could only find for the plaintiff by relying on speculation, the defendant is entitled to judgment.") (quoting <u>Fuller v. City of Rutland</u>, 122 Vt. 284, 289 (1961)). Thus, there is nothing to connect the alleged conspiracy with Plaintiff. The Diocese is entitled to summary judgment on this claim.

<u>Order</u>

The court grants the Diocese's motion for summary judgment as to the claims for conspiracy, breach of fiduciary duty, and intentional infliction of emotional distress (Counts 1, 3, and 7), but denies it as to the claims for negligent supervision and failure to prevent harm (Counts 4 and 6). The case shall be placed on the February jury draw. Electronically signed on November 16, 2023 pursuant to V.R.E.F. 9(d).

_____
Helen M. Toor
Superior Court Judge